**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

**Case No. _____**

| | |
|---|---|
| PICKENS COUNTY BRANCH OF THE NAACP;<br><br>STUDENTS AGAINST BOOK BANNING;<br><br>J.T. and G.T., by and through their parents, Rebecca Turner and Brandon Turner;<br><br>H.L. and C.L., by and through their parents Susanna Ashton and Peter Laurence;<br><br>L.K., by and through their mother, Cary Berkeley Kaye,<br><br>*Plaintiffs*,<br><br>v.<br><br>SCHOOL DISTRICT OF PICKENS COUNTY,<br><br>*Defendant*. | **COMPLAINT** |

**INTRODUCTION**

1.      *Stamped: Racism, Antiracism, and You* ("*Stamped*") is a #1 New York Times bestselling book by Ibram X. Kendi and Jason Reynolds. The book describes and deconstructs the history of racist thought in America and was written specifically for young-adult readers.

2.      In the introduction of *Stamped*, Kendi explains his purpose in writing the book:

> The first step to building an antiracist America is acknowledging America's racist past. By acknowledging America's racist past, we can acknowledge America's racist present. In acknowledging America's racist present, we can work toward building an antiracist America. An antiracism America where no racial group has more or less, or is thought of as more or less.

*Stamped: Racism, Antiracism, and You*, p. xv. (Introduction).

1

3.     On September 26, 2022, the Board of Trustees ("Board") of the School District of Pickens County ("SDPC" or "District") voted to remove *Stamped: Racism, Antiracism, and You* from every classroom, library, and media center in the District for 5 years.

4.     The Board's vote overrode the findings of the school- and district-level review committees, which both unanimously recommended—after review and discussion—that *Stamped: Racism, Antiracism, and You* should remain available to students because it is a "developmentally appropriate" high-school level resource that is aligned with dozens of the South Carolina Department of Education's English Language Arts (ELA) standards for high school students.

5.     The Board's 7-0 vote to remove *Stamped: Racism, Antiracism, and You* was pure censorship. No legitimate governmental or pedagogical interest is furthered by removing *Stamped*, and no such interest was even invoked by the Board. Rather, the vote was a calculated decision by seven white Board members to suppress ideas that they personally and politically oppose, in hopes that fewer students would be exposed to them.

6.     On April 26, 2023, a group of plaintiffs sued the District for declaratory and injunctive relief under the First Amendment.[1] They also sought a preliminary injunction restoring access to *Stamped*.

7.     10 days after Plaintiffs moved for a preliminary injunction, the Board met in executive session with its litigation counsel and slightly modified their removal decision. Starting July 10, 2023, *Stamped* was prohibited in all District classrooms and only available from District libraries with proof of parental consent.

---

[1] That case was docketed as Case No. 8:23-cv-01736-JDA and involved many of the same plaintiffs as this action. The Honorable Judge Jacquelyn Austin dismissed that case *without prejudice* on October 7, 2025, for lack of standing. *See Pickens NAACP v. Sch. Dist. of Pickens Cnty.*, Case No. 8:23-cv-01736-JDA, ECF No. 72 (Oct. 7, 2025). When the plaintiffs filed an Amended Complaint, Judge Austin struck that filing and directed the plaintiffs, "should they wish to pursue their claims," to "file a separate civil action." *Id.* at ECF No. 75 (Jan. 7, 2025). This Complaint corrects the jurisdictional issues from that action, including by adding new facts, plaintiffs, and claims for relief.

8.      Board members then each signed materially identical sworn affidavits that asserted a new, rehearsed justification for removing *Stamped*—that it contains "factual errors and omissions."

9.      Invented, post hoc justifications cannot satisfy First Amendment scrutiny. The school library is a place of exploration, not inculcation. The First Amendment guards the school library against orthodoxy and indoctrination, and protects students' rights to inquire, to study and evaluate, and to gain new ideas and understanding.

10.     State law may grant the Board considerable curricular control, but the Board may not exercise that authority to silence views based on its political and partisan preferences. Because the removal of *Stamped: Racism, Antiracism, and You* casts a pall of orthodoxy over the District and continuously injures Plaintiffs' First Amendment rights to access the book and encounter the ideas it contains, the Court should grant declaratory and injunctive relief on behalf of all Plaintiffs.

11.     Plaintiffs J.T., H.L. and L.K. are also entitled to nominal damages for the specific harms caused by Defendant's library and curricular censorship.

12.     On December 1, 2023, Plaintiff J.T. tried to check out *Stamped* from the D.W. Daniel High School library and found that—despite the Board's July 2023 decision to reinstate the book subject to parental consent—the book was no longer in their library catalog.

13.     H.L. had the same experience when he attempted to check out *Stamped* during the fall semester of 2024. When he asked for the book at the Daniel school library, the library's assistant told him that the library did not have the book and that it was not certain the library could acquire the book.

14.     *Stamped*'s unavailability (with or without parental consent) was no mistake; the book was never reshelved. Almost two years after the Board's decision to reinstate *Stamped*, on November 18, 2025, the Assistant Principal for D.W. Daniel High School, Sam Lepa, confirmed in an email that *Stamped* is no longer part of the high school's collection.

3

15.    H.L. and L.K. also experienced First Amendment injuries in the classroom. Each student took English III Honors at D.W. Daniel High School and, but for Defendant's curricular prohibition, would have chosen to read *Stamped* as part of the course's unit on the "American Dream." Before Defendant's censorship, *Stamped* was an available option for students in that unit. H.L. and L.K.'s First Amendment right to access to *Stamped* in their English 3 course was therefore violated by Defendant's censorship.

## PARTIES

16.    **Plaintiff Pickens County Branch of the NAACP** (Pickens NAACP) is a nonprofit, nonpartisan membership organization in South Carolina. The Pickens NAACP has served its members in Pickens County, SC, since 1967. The Pickens NAACP is a branch of the National Association for the Advancement of Colored People (NAACP), a national civil rights organization. The NAACP's mission is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." The Pickens NAACP represents members and children of members who attend school throughout the School District of Pickens County, including at D.W. Daniel High School, Pickens High School, Liberty High School, and Easley High School. Those members have been and continue to be injured by Defendant's unconstitutional viewpoint censorship of District classrooms, libraries, and media centers. In furtherance of its mission, the Pickens NAACP seeks to ensure its members, and all children, have access to equity and inclusion and are free from discrimination in education.

17.    **Plaintiff Students Against Book Banning ("SABB")** is an unincorporated student organization in the School District of Pickens County. SABB was founded by Plaintiff L.K. and its purpose is to advocate against book bans. Members of SABB are students at D.W. Daniel High School who oppose book banning.

4

18.     **Plaintiffs J.T. and G.T.** are minor children who bring this action by and through their parents, Rebecca Turner and Brandon Turner. J.T. is in their fourth year at D.W. Daniel High School. G.T. is in her second year at D.W. Daniel High School.

19.     **Plaintiffs H.L. and C.L.** are minor children who bring this action by and through their parents, Susanna Ashton and Peter Laurence. H.L. is in twelfth grade at D.W. Daniel High School. C.L. is in tenth grade at D.W. Daniel High School.

20.     **Plaintiff L.K.** is a minor child who brings this action by and through her mother, Cary Kaye. L.K. is in her third year at D.W. Daniel High School. L.K. is also the founder and current president of Students Against Book Banning, a student group made up of students at D.W. Daniel High School.

21.     **Defendant School District of Pickens County** ("SDPC" or "District") is the lone public school district designated by the State of South Carolina to provide school education to students in Pickens County. Defendant SDPC is a body politic and corporate. Under its name, it may sue and be sued.

22.     SDPC has local, state, and federal funding. According to its recent audited financials, SDPC's revenue from local sources (such as local taxes) equaled $60,872,419. Local revenue contributions will not seriously fluctuate in subsequent fiscal years. Thus, a monetary judgment issued against SDPC will not affect South Carolina's treasury.

## JURISDICTION AND VENUE

23.     Plaintiffs' claims are brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

24.     This Court has jurisdiction to hear Plaintiffs' claims under 28 U.S.C. §§ 1331, 1343, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

25.     Venue is proper in the United States District Court for the District of South Carolina under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit occurred principally in this judicial district. The District of South Carolina is also an

appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

26.     Venue is proper in the Anderson division under Local Rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

## STATEMENT OF FACTS

### A.     School District of Pickens County

27.     SDPC is governed by an all-white, seven-member Board of Trustees. Board members include Betty Bagley, Randy Robinson, Shannon Haskett, Brad Dover, Betty Garrison, Karla Kelley, and Amy Williams. The Board believes that its most important function is the formulation and adoption of policy, including selection of textbooks and other curricular decisions.

28.     The Board is responsible for selecting the District's superintendent. The superintendent is responsible for executing SDPC policies. The Board delegates certain executive powers to the superintendent to manage the schools within the established policies. The District superintendent is Danny Merck.

29.     Despite whatever control the State of South Carolina may wield in certain areas, the District, acting through its Board of Trustees, has final and exclusive authority to resolve challenges to instructional materials.

30.     The injunctive relief requested in this case—setting aside the District's unconstitutional removal of *Stamped: Racism, Antiracism, and You* and having all copies re-shelved—does not implicate South Carolina's authority, treasury, or dignity.

31.     The nominal damages requested in this case similarly do not implicate South Carolina's authority, treasury, or dignity.

B.    *Stamped: Racism, Antiracism, and You*

32.    *Stamped: Racism, Antiracism, and You* is a #1 New York Times bestseller by Ibram X. Kendi and Jason Reynolds. The book chronicles the history of racist ideas in America and explores how those ideas manifest today.

33.    *Stamped: Racism, Antiracism, and You* is an adaptation of Kendi's seminal work, *Stamped from the Beginning*, and is written specifically for young adults. The book received book-of-the-year honors from *Parents Magazine* and *Publishers Weekly*, was awarded Best Children's Book of the Year by *The Washington Post*, and was listed on *TIME Magazine*'s Ten Best Children's and Young Adult Books of the Year.

34.    The National Educators Association ("NEA") categorizes *Stamped: Racism, Antiracism, and You* as a "young adult level" book and provides access to an educator guide, book club guide, and other classroom resources.

35.    In 248 pages, *Stamped* uses informal prose to trace the history of racism in the Western world from a man Kendi dubs "the first racist"—Gomes Eanes de Zurara—through to the election of President Barack Obama and, later, the #BlackLivesMatter movement.

36.    Despite following the chronological structure of an ordinary history text, Reynolds devotes the very first paragraph of the book to denying that *Stamped* is a history book:

> BEFORE WE BEGIN, LET'S GET SOMETHING STRAIGHT. This is not a history book. I repeat, this is *not* a history book. At least not like the ones you're used to reading.

*Stamped: Racism, Antiracism, and You* at 1.

37.    So, if not a history book, what is *Stamped*? Reynolds tells his readers on the next page:

> *This is a present book.* A book about the here and now. A book that hopefully will help us better understand why we are where we are as Americans, specifically as our identity pertains to race.

*Stamped: Racism, Antiracism, and You* at 2 (emphasis added).

38.    *Stamped* makes its way through many of the topics, figures, and events that are already familiar to a high school student (because they are common subjects of a traditional K-12 curriculum): Cotton Mather, Jonathan Edwards, and Puritanism; the Revolutionary War, Thomas Jefferson, and the Founding Era of the United States; John C. Calhoun,[2] Phillis Wheatley, Frederick Douglass, Abraham Lincoln, and the Civil War; W.E.B. Du Bois, World War I and II, and *Brown v. Board of Education*; and so on and so on.

39.    *Stamped* also introduces its readers to figures who may be less familiar to the average high school student, *e.g.*, Marcus Garvey, Angela Davis, and Malcolm X.

40.    *Stamped* does not claim to be giving, or even that it is possible to give, a "neutral" account of history. Quite the contrary. *Stamped* is history filtered through a specific lens—the development, expansion, and influence of racist thought.

41.    Nor do the authors pretend that *Stamped* presents history for history's sake—no, it is history for the present's sake. It is history for the sake of answering a single question:

> [W]hether you, reader, want to be a segregationist (a hater), an assimi-
> lationist (a coward), or an antiracist (someone who truly loves).

*Stamped: Racism, Antiracism, and You* at 247.

42.    Finally, the book contains twenty pages of source notes, which offer curious readers a springboard into the formal histories and primary source documents that undergird the book's conversational and opinion-filled account of the history of American racist thought. *Id.* at 263-84.

---

[2] A Senator from South Carolina and later a Vice President of the United States, John C. Calhoun is familiar to any resident of this state. Our roads, bridges, and schools bear his name. Among other things, Calhoun is remembered as a strident defender of slavery and instigator of the Civil War. In his own words, Calhoun believed that slavery was "instead of an evil, a good—a positive good." Clyde Wilson, *John C. Calhoun & Slavery as a "Positive Good": What He Said*, ABBEVILLE INST. PRESS (June 26, 2014), available at: https://www.abbevilleinstitute.org/john-c-calhoun-and-slavery-as-a-positive-good-what-he-said/.

C.  ***Stamped: Racism, Antiracism, and You*** **is consistent, in both content and form, with South Carolina educational standards for high school English.**

43.  The South Carolina Department of Education issues priority and support learning standards for its English Language Arts ("ELA") curricula.

44.  "Priority Standards" are "a carefully selected subset of the total list of the grade-specific and course-specific standards within each content area that students must know and be able to do by the end of each school year in order to be prepared for the standards at the next grade level or course. Priority standards represent the assured student competencies that each teacher needs to help every student learn, and demonstrate proficiency in, by the end of the current grade or course."

45.  "Support Standards" are "those standards that support, connect to, or enhance the Priority Standards. They are taught within the context of the Priority Standards, but do not receive the same degree of instruction and assessment emphasis as do the Priority Standards. The supporting standards often become the instructional scaffolds to help students understand and attain the more rigorous and comprehensive Priority Standards."

46.  Many of South Carolina's ELA standards require that students develop skills necessary to analyze and respond critically to works like *Stamped: Racism, Antiracism, and You*.

47.  State Standards that govern English I-IV (high school English) require students to read, analyze, and evaluate persuasive writing. Indeed, those courses are designed to prepare students to identify when and how an author is straying from an informational project and into a rhetorical one.

48.  For example, RI.10.1, which is a priority standard for English I, mandates that students be taught to "determine an author's point of view or purpose in a text and analyze how an author uses rhetoric to advance that point of view or purpose."

49.  Additionally, RI.5 for English I and II requires students to "[d]etermine meaning and develop logical interpretations by making predictions, inferring, drawing conclusions,

analyzing, synthesizing, providing evidence and investigating multiple interpretations" when reading informational texts.

50.     Likewise, at the English III level, priority learning standard RL.11.1 requires that students be taught to "analyze how point of view and author's perspective and purpose shape content, meaning, and style, supports rhetorical or aesthetic purposes, and conveys cultural experience."

51.     Nested below that priority standard are several supporting standards, such as developing messages that "use logical, emotional, and ethical appeals," and analyzing an author's use of "diction, conventions, figurative language, and/or language that is particularly fresh, engaging, or beautiful."

52.     Another priority standard, RI.10.1 requires that students be taught to "determine an author's point of view or purpose in a text in which the rhetoric is particularly effective, analyzing how style and content contribute to the power, persuasiveness, or beauty of the text."

53.     Similarly, supporting standard RI.11.2 requires that students be taught to "analyze and critique the reasoning in historical, scientific, technical, cultural, and influential argument writing."

54.     To acquire and practice these skills, students must read works that exemplify these qualities. According to the South Carolina Department of Education, high school English students should read "a variety of fiction, literary nonfiction, poetry, and drama from across cultures, places, and time periods. Literary text types should include historical fiction, contemporary fiction, myths, allegories, parodies, monologues, short stories, novels, and graphic novels."

55.     English 3 students "should also read expository, persuasive, and informational texts that can include, but are not limited to, research reports, political and social essays, historical speeches and essays, news articles, journals, reviews, government documents, instruction manuals, editorials, and biographical and autobiographical sketches."

56.     There is no question that *Stamped: Racism, Antiracism, and You*—which blends historical evidence, rhetoric, and accessible style—is a highly appropriate exemplar for students to examine, analyze, and develop the skills required by State ELA standards.

**D.     Use of *Stamped: Racism, Antiracism, and You* at D.W. Daniel High School**

57.     Following its publication in 2020, *Stamped: Racism, Antiracism, and You* was used as a companion text by English 3 (junior level American Literature) classes at D.W. Daniel High School—one of three high schools in the District.

58.     *Stamped* was assigned to help students "analyze accuracy, tone, argument, and bias," and was not taught as a history text.

59.     Teachers using *Stamped* in their classrooms notified parents, explained the purpose of the book's inclusion in the curriculum, and provided students and parents an opportunity to opt out of the reading (without missing instruction or affecting grades).

60.     Even in English 3 classrooms where *Stamped* was not explicitly assigned, it was available as an optional text for students to read and analyze as part of the course's unit on the American Dream. As part of that unit, students choose books to read from a list given to students during the unit. Until the District removed *Stamped*, it was on the list given to students during the "American Dream" unit.

61.     As a result of the Board's removal decision, *see infra* Part G, *Stamped* is no longer available for students to read and analyze as part of their English 3 curriculum.

**E.     Political Opposition in South Carolina to the Idea of Antiracism**

62.     The debate over how best to acknowledge and respond (if at all) to racism in America is unmistakably political. Political conservatives have taken the position that teaching students about America's racist history and trying to remedy the legacy of racial injustice is somehow un-American.

63.     Lately, the political fight over how Americans should be thinking about, talking about, and responding to our corporate legacy of racism has hit a fever pitch.

64.    Nationally and locally, an extremist sect of conservatives is engaged in a calculated effort to indoctrinate children to the sect's ideology by bullying teachers and administrators into not exposing students to ideas and opinions that the sect believes align with liberal and progressive ideologies—particularly around issues concerning race and non-heteronormative gender and sexuality.

65.    The name of that sect in South Carolina is the "South Carolina Freedom Caucus." When the District initially banned *Stamped* in 2022, the Freedom Caucus comprised approximately twenty members of the South Carolina House of Representatives.[3] Of the twenty members, seventeen were male. All twenty were white.

66.    The Freedom Caucus is responsible for the supposedly anti-CRT Budget Proviso, 1.105, which the General Assembly has enacted every year since 2021.[4]

67.    The white South Carolinians who act under the banner of the Freedom Caucus believe that their opinions on race are correct and that all other opinions are wrong and dangerous.

68.    The Freedom Caucus and its followers believe that colorblindness, i.e. deliberately ignoring racial or cultural difference, is the only appropriate response to racism. So much so, the Freedom Caucus has sued two South Carolina school districts—Charleston and Lexington One—ostensibly for acknowledging racial differences.[5]

---

[3] In 2025, the South Carolina Freedom Caucus has 16 members. All are white, and 13 are male.

[4] H. 4100, 2021–2022 Gen. Assemb., 124th Sess., Part 1B § 1.105 (S.C. 2021); H. 5150, 2021–2022 Gen. Assemb., 124th Sess., Part 1B § 1.93 (S.C. 2022); H. 4300, 2023–2024 Gen. Assemb., 125th Sess., Part 1B § 1.82 (S.C. 2023); H. 5100, 2024–2025 Gen. Assemb., 125th Sess., Part 1B § 1.79 (S.C. 2024); H. 4025, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.78 (S.C. 2025).

[5] *See S.C. Freedom Caucus v. Postelwait*, 2022-CP-3203931 (Nov. 16, 2022).

69.     Those lawsuits were celebrated by Conservatives of the Upstate ("COTU"), an influential political organization in Pickens County.



70.     The Freedom Caucus believes that Ibram X. Kendi's concept of antiracism is a theory of "racial primacy" that should be eradicated from South Carolina classrooms. According to its complaint filed against Lexington School District One, "Critical Race Theory," "antiracism," "culturally responsive teaching, or diversity, equity, and inclusion," are all "the same pernicious, racist nonsense." *Postelwait*, Compl. at ¶ 5.

71.     Public statements made by State Superintendent, Ellen Weaver, reinforce that South Carolina's anti-CRT crusade is pure political censorship. Speaking to voters in June 2022, Weaver warned that "CRT is a worldview that is . . . everywhere in our educational system," and promised to use her office to stop "woke Washington ideology" from infecting South Carolina classrooms.

72.     Weaver's viewpoint crusade is acutely on display in the materials of her former organization, the Palmetto Promise Institute ("PPI").[6] According to PPI's 2022 Report, K-12 classrooms are a battleground for "young South Carolina minds." Within this McCarthy-esque war fantasy, Weaver pits her own views—which include colorblindness, free-market capitalism,

---

[6] Weaver continued to serve as President and CEO of PPI until she was sworn in as Superintendent in January 2022.

and portraying America as a "shining city on a hill"—against the anti-capitalist and "race-first" views of her enemies, which include "Progressives," the National Education Association (NEA), the South Carolina Education Association, the South Carolina Association of School Librarians, school accreditors, and "litigators."

73.     As seen below in PPI's rigidly dichotomous chart, Weaver views education, culture, economics, and history as neatly aligning with America's two-party political system. As relevant here, the chart explicitly invokes Kendi's concept of "antiracism," which she views as "neo-segregation," and contrasts it to colorblindness, which she considers to be a path toward "racial reconciliation."



74.     Ibram X. Kendi, author of *Stamped from the Beginning* and co-author of *Stamped: Racism, Antiracism, and You*, is a favorite villain of the Freedom Caucus and the broader anti-CRT movement. Kendi is cited twice in the Freedom Caucus's thirteen-page complaint against Lexington One, with his views held out as an example of an illegal way to think about race. Kendi is also cited repeatedly throughout the PPI's 2022 report as one of the founding fathers of the "indoctrination" worldview.

**F.     SDPC Policy for Challenging Instructional Materials**

75.     When this suit was originally filed, the District followed its own 4-step policy for receiving and responding to challenges to instructional or library materials. In 2024, that policy was superseded by the enactment of Regulation 43-170, "Uniform Procedure for Selection or Reconsideration of Instructional Materials." S.C. Code Ann. Regs. 43-170.

76.     The District banned *Stamped* using its previous policy, which comprises the following four steps:

Step 1

77.     At "Step 1," a parent or community member would bring a concern about a material or resource directly to the principal of the school that the resource is being used.

78.     The principal would provide the person making the challenge with four copies of form "IJ-E."

79.     The challenger then completed the IJ-E form and returned one copy to the principal, superintendent, and teacher/media specialist. The person retained the final copy for their own records.

Step 2

80.     At "Step 2," the principal appointed a school-level board of review composed of the following: (1) a teacher from the school; (2) a media specialist or instructional coach; (3) an administrator from the school; and (4) a parent or legal guardian of a child enrolled in the school.

81.     The principal was responsible for selecting the members of the school-level board of review. To ensure objectivity, the board of review could not include any parties involved in the matter.

82.     Once selected, the school-level board of review would review the material "in the light of the objection(s) raised." The school-level board would consider the material in view of the best interests of the students, the community, the school, and the curriculum.

83.     After completing their review of the material, the school-level board of review would submit a written report of its findings to the principal. The report did not need to be unanimous, and could contain separate majority and minority reports.

84.     The written report would also be provided to the person(s) who raised the challenge.

Step 3

85.     At "Step 3," the original filer of the complaint could accept the school-level board's decision or appeal its findings to the District.[7]

86.     If the recommendation was to remove the material, that decision applies at the school level only.

Step 4

87.     "Step 4" would only commence if the complainant appealed the school-level review findings to the District.

88.     At "Step 4," upon receipt of the complaint, the District superintendent would appoint a district-level board of review comprised of the following: (1) a district-level curriculum coordinator; (2) a media specialist or instructional coach in the District; (3) a teacher that is especially competent in the questioned field; and (4) one parent or legal guardian of a child enrolled in the school attendance area involved in the challenge. The District

---

[7] The new process required by Regulation 43-170 skips school-level review, beginning at the district level.

superintendent or his/her designee would serve as chairperson of the District's review committee.

89.     Like at school-level review stage, the district-level committee could not include any party involved in the challenge.

90.     After reviewing the challenged material, the district-level committee would make a recommendation to the Board. The recommendation was made through a form, which allowed the committee to specify how and where the material may be used.

91.     The form allowed the committee to restrict access to certain age groups (elementary, middle, and high school) and to restrict the book's location (classroom, library, and media center). Finally, the committee could recommend that the material be available only with parental permission.

92.     Like the school-level review, the district-level committee's recommendation did not need to be unanimous.

93.     According to District guidelines, a decision of the Board had "a three-year shelf life."

94.     Unlike at the school-review stage, a decision by the Board to remove a challenged material applied District-wide.

**G.     Fall 2022 Challenge to *Stamped: Racism, Antiracism, and You***

   i.     <u>Three Parental Challenges to *Stamped* (Step 1)</u>

95.     In August 2022, IJ-E forms were submitted by three parents who objected to any use of *Stamped: Racism, Antiracism, and You* at D.W. Daniel High School, where the book was being used in at least one English 3 Honors course.

96.     Susan Jo Van Fleet submitted an IJ-E form arguing that, although she had not read the book, it should be removed from any public school or public library because it "promote[s] socialism."

97.     Amanda Hollensbe submitted an IJ-E form arguing that "no one should read [*Stamped*]" because "it demonstrates radical Marxism infecting our schools and our culture." Ms. Hollensbe also argued that any use of *Stamped* violates South Carolina Budget Proviso 1.105, which she views as prohibiting the teaching of Critical Race Theory.

98.     Finally, Jessica Rae Martin submitted an IJ-E form arguing that *Stamped* should be removed from the District because it constitutes "objectible [sic] indoctrination." Ms. Martin also took particular issue with the author's use of the word 'basically' to insert his own interpretation of an event or subject.

ii.     <u>School-level Committee Response (Step 2)</u>

99.     Following the three parental complaints, D.W. Daniel High School convened a committee to resolve the challenges.

100.    First, the committee reviewed the parent-submitted materials, the South Carolina ELA standards, and Budget Proviso 1.105. The committee then spoke directly with an English teacher currently using the text.

101.    After completing its review, the committee concluded that: (1) the way *Stamped: Racism, Antiracism, and You* was being used "does not amount to inculcating students into any theory or perspective[;]" and (2) the proposed use of *Stamped* "aligns with SC ELA standards."

102.    The school-level committee unanimously agreed that "this text is developmentally appropriate for high school students to analyze accuracy, tone, argument, and bias," and recommended that *Stamped* "should remain as a resource available to students at D.W. Daniel High School, whether in a classroom or on a bookshelf."

103.    To buttress its conclusion, the school-level committee cited 27 different State ELA standards that are furthered by reading and discussing *Stamped*, including standards covering "Reading Literary Texts," "Writing," "Communication," and "Inquiry-Based Literacy Standards."

iii.    <u>District-level Committee Response (Steps 3 & 4)</u>

18

104.    Ms. Hollensbe, one of the original complainants, appealed the school-level review committee's decision.

105.    In an email to D.W. Daniel High School Principal Culler, Ms. Hollensbe argued that it is "irrefutable" that *Stamped* violates Budget Proviso 1.105 because the proviso "was written with this book in mind specifically." She then threatened that, unless the District removed *Stamped*, she would "bring this issue of CRT indoctrination of SDPC students to parents, school board members, law makers, and media across the state, or as Governor McMaster put it, 'To the Gates of Hell.'"

106.    In response to Ms. Hollensbe's letter, the District superintendent convened a district-level review committee.

107.    The district-level review committee reviewed the complaint and appeal, read the entire book, and reviewed the school-level findings and response.

108.    After the review, the district-level committee recommended, by a unanimous 5-0 vote, that *Stamped* be approved as a classroom instructional resource for high school level students. The committee approved of the book's use as a "choice selection" or as a "whole-class instruction" with an alternate assignment.

109.    The district-level committee also concluded that *Stamped* is an appropriate classroom, library, and media center resource at District high schools.

110.    In explaining its recommendation, the district-level review committee stated that "[t]he teacher's communicated purpose for use and alignment with the standards is important to articulate the intent for the selection of this book. This committee agrees that this text is developmentally appropriate for high school students to analyze accuracy, tone, argument, and bias."

   iv.    <u>Public Comments to the Board</u>

111.    The Board held its monthly meeting on August 22, 2022.

112.    At that meeting, the Board received public comments from the community. The use of *Stamped: Racism, Antiracism, and You* was the focus of each comment.

113.    Many commenters opposed the ideas contained in *Stamped*, including parent challenger Amanda Hollensbe (the same parent who appealed the school- and district-level committee decisions). Another speaker, Matthew Kutilek, for example, told Board members that he would "fight to the death to ensure that [his] daughters and the sons and daughters of the people in this crowd . . . are not being indoctrinated by a racist, anti-American, Marxist ideology perpetrated by Ibram X. Kendi." He then addressed the Board saying, "I ask you to fight the same and do the same thing."

114.    Matthew Kutilek ran unsuccessfully for the State House District 4 in 2022, losing in the Republican primary to Davey Hiott. Mr. Kutilek's campaign webpage shared his views on local school issues, arguing that "[t]he purpose of schools is not indoctrination of the latest woke and destructive ideology."

115.    Thomas Beach, freshman state representative from Pickens County, was one of the individuals that attended the Board meeting to share his thoughts.

116.    Mr. Beach identified himself as a member of the Freedom Caucus and warned that unless the Board removed *Stamped*, the District could face adverse action from the State or from the Freedom Caucus.

117.    Another speaker echoed the political opposition voiced by these opponents to *Stamped*, arguing that "critical race theory . . . [is] a neo-Marxist theory" with a goal of "hav[ing] a Marxist revolution."

118.    One speaker, Johnnelle Raines, who is affiliated with the organization "Conservatives of the Upstate," a conservative political and religious organization, and has written about these concerns on the organization website, also voiced her concerns at the meeting. Board Member Amy Williams has also written articles about challenged books on this organization's website.

20

119.    Though there were several opponents of *Stamped* who spoke at the meeting, one woman spoke in support of *Stamped* and shared her views on why she believes the book has educational value. The following speaker addressed the audience, stating, "I'm going to offend some of you, you can have a talk with me afterwards." In response, Board Member Karla Kelley (who was the Chair of this meeting) interjected and, referring to the woman who spoke in support of *Stamped*, said, "she's right there."

120.    After comments from the community closed, Board Member Kelley opened the conversation up for comments from members of the Board of Trustees. At this point, Board Member Williams shared she "[has] extremely strong political leanings" and "most people in this room know which way I lean." She stated that she agreed with two of the speakers, including Ms. Hollensbe.

v.    September 26, 2022, Board of Trustees Meeting

121.    On September 26, 2022, the Board heard additional public comments and received the findings of the District-level book review committee. After receiving that input, the Board debated and then voted on whether to remove *Stamped*.

122.    Heather Mitchell, Chair for the Pickens County chapter of Moms for Liberty, a conservative political group that is known for pushing for the removal of dozens of books in South Carolina and nationwide,[8] spoke in opposition to *Stamped*. Ms. Mitchell argued the book is "political and biased to the point of being propaganda," and that it "openly embrac[es] Marxism." Ms. Mitchell also shared concerns about the book "idoliz[ing] Angela Davis," who

---

[8] Moms for Liberty has advocated for the viewpoint-based removal of dozens of books that span numerous topics, including books that discuss race (*The Bluest Eye* by Toni Morrison), gun violence (*People Kill People* by Ellen Hopkins), sexism and Christian fundamentalism (*The Handmaid's Tale* by Margaret Atwood), and sexuality (*All Boys Aren't Blue* by George M. Johnson). *See, e.g.*, Emma Parkhouse, *Teachers, librarians & parents argue banning books in HCS will hurt students*, ABC15 News (January 23, 2023) (available at: https://wpde.com/newsletter-daily/horry-county-teachers-librarians-parents-banning-books-students-library-english-moms-for-liberty-south-carolina). Amanda Hollensbe, the primary challenger of *Stamped* in Pickens County, is the Secretary of the Pickens Branch of Moms for Liberty.

she describes as "a Marxist [and] member of the Communist Party USA." She argued the book "is putting a heavy thumb on the scale of a very divisive, controversial, and political topic." She warned the Board that if it voted to allow "Marxist ideology to become required reading," Moms for Liberty would campaign for a "liberty-minded candidate" to take their seats when they are up for re-election.

123.     Another speaker told the Board, "I teach my children to love like Jesus loved and this is not what this book is doing."

124.     After public comments, the District's assistant superintendent presented the district-level review findings to the Board.

125.     The district-level review committee unanimously recommended to the Board that *Stamped* should remain an available classroom, library, and media center resource for high school students.

126.     Despite the committee's findings, a Board member moved to remove *Stamped* "from our classrooms and any use in our schools whatsoever for a period of five years."

127.     The motion immediately received a second and then received discussion.

128.     One Board member expressed his view that "taxpayers shouldn't be paying for something [like *Stamped*]."

129.     Another Board member added that he has "no doubt" that "there's some thought-provoking things in the book," but that it is "divisive" and isn't appropriate "anywhere in any school in any district."

130.     Board member Williams brought up *Board of Education, Island Trees Union Free School District Number 26 v. Pico*, 457 U.S. 853 (1982), and explained that although the Supreme Court held that removing books from school classrooms is "tantamount to limiting someone's First Amendment right," she believed the Court's decision was outdated and lacked relevance to the Board's decision. She explained that because *Pico* was "back in 1982" and that "we now have Amazon [and] we have public libraries," it is "clearly in our purview to decide if this [book] is appropriate or not."

22

131.    In response, a Board member noted that he had heard speakers reference the Constitution, the Declaration of Independence, freedom of speech, and freedom of religion, but that "I think we all agree this is an opinion piece. I read it. It doesn't belong in the classroom."

132.    During the discussion, one Board member—Ms. Kelley—moved to amend the motion for total removal of *Stamped* to allow media center access for high school students, but only with signed, witnessed, parental consent.

133.    When voted upon, the amendment received only two votes and was rejected.

134.    After Board member Kelley's amendment was rejected, the Board voted on the initially proposed five-year ban. The vote was 7-0 for completely removing *Stamped*.

      vi.    <u>Conservative Political Praise for the Board's Removal of *Stamped*</u>

135.    The next day, Freedom Caucus representative Thomas Beach—the same person who threatened the Board at its August 22, 2022, meeting—claimed credit for pressuring the District to remove the book.



Thomas ✔
@ThomasBeach

Big win in SC Pickens Co Schools. School Board removes material that taught students about oral sex and pushed CRT due to pressure from parents and threat of refund of taxpayer money for breaking state proviso laws signed by @SCFreedomCaucus members.

8:16 AM · Sep 27, 2022

136.    Political and religious group Conservatives of the Upstate ("COTU") echoed Beach's comments and applauded the exertion of conservative political pressure on the Board to remove *Stamped*.



COTU
@COTUleadership

Unanimous decision to REMOVE the book STAMPED by our School Board! Pressure works! Thank you to all who wrote and called the SDPC Board members and told them that book must be REMOVED! And thank you Board Members for respecting SC law and listening to WE THE PEOPLE!

8:15 PM · Sep 26, 2022

137.    On the COTU website, Johnnella Raines (one of the public commenters at the Board's September meeting) wrote a post thanking God for the victory, as well as representative Thomas Beach, the Freedom Caucus member who spoke against *Stamped*.

138.    Notably, there is entanglement between COTU and Defendant SDPC. For example, District Board Member Amy Williams wrote an opinion article for the COTU website where she expressed her views about other challenged materials.

139.    COTU has been consistently involved in the Board's decision to remove *Stamped*. COTU expressed public support for Amanda Hollensbe, one of the original challengers of *Stamped*, on the organizations' website.

140.    In March 2023, COTU posted a speech on its website that was delivered by one of the organization's members to the SDPC Board. In that speech, COTU member Luke Campbell explained that *Stamped* was "banned" by the Board because of its "content." He went on to state:

> At the last few school board meetings, people have very eloquently talked about banning books, and how that's a bad thing. In general, everyone's going to agree on that. The problem is that talking about "banning books" completely misses the point . . . the point is about content.

141.    Later, Campbell repeated his refrain that *Stamped* was removed to keep students from being exposed to the *content* of the book:

> School kids are not going to pick up a book like this from the library or a classroom shelf and look at the cover and then put it back . . . they're going to look at the content. The content is destructive; it harms those who get involved with it.

142.    Campbell concluded that, in his view, the "ideas and material[s]" in *Stamped* are so destructive that failing to "eliminate [it] from our kids' reach" would have been tantamount to "child abuse."

**H.    Hostility toward the ideas and opinions contained in *Stamped: Racism, Antiracism, and You* was the decisive factor in the District's decision to remove the book.**

      i.    <u>The Board's decision to remove *Stamped* was not justified by any legitimate interest.</u>

143.    The Board's decision to remove *Stamped* was not based on any legitimate curricular motivation.

144.    There was no suggestion that *Stamped* contains inappropriate language, vulgarity, or adult sexual content.

145.    No Board member argued that the book contained any particular inaccuracy or that it was being inappropriately taught as history rather than as persuasive writing.

146.    No Board member discussed, addressed, or even mentioned the findings or conclusions of the school-level review committee.

147.    No Board member discussed, addressed, or even mentioned the findings or conclusions of the district-level review committee.

148.    No Board member discussed, addressed, or mentioned the South Carolina curricular standards.

149.    No Board member discussed, addressed, or mentioned any of the 27 ELA standards that were cited by the school-level review committee as being consistent with the use of *Stamped* for English 3. Indeed, these standards appeared irrelevant to the Board's decision. In the words of one Board member, "I think we all agree this is an opinion piece. I read it. It doesn't belong in the classroom."

150.    But there is nothing inappropriate about a school or district assigning, possessing, or loaning out a book that contains an opinion; in fact, State Standards *require* it. As discussed in Part C, South Carolina's ELA standards require students to read, analyze, and evaluate works that are designed to persuade the reader by using evidence or rhetoric to shift his or her opinion.

    ii.   <u>South Carolina Budget Proviso 1.78 does not prohibit SDPC from possessing, loaning, or assigning *Stamped*.</u>

151.   Two of the original complainants, Amanda Hollensbe and Jessica Martin, cite South Carolina Budget Proviso 1.105 (now Proviso 1.78 in the 2025-26 budget) in their objection to *Stamped*.

152.   But the Board does not invoke compliance with Proviso 1.78 as the basis of their removal of *Stamped*, and for good reason.

153.   Budget Proviso 1.78 prohibits the use of materials that "serve to inculcate" various bigoted concepts, like that "one race or sex is inherently superior to another." In full, the Proviso states:

> (SDE: Partisanship Curriculum) For the current fiscal year, of the funds allocated by the Department of Education to school districts, no monies shall be used by any school district or school to provide instruction in, to teach, instruct, or train any administrator, teacher, staff member, or employee to adopt or believe, or to approve for use, make use of, or carry out standards, curricula, lesson plans, textbooks, instructional materials, or instructional practices that serve to inculcate any of the following concepts: (1) one race or sex is inherently superior to another race or sex; (2) an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) an individual should be discriminated against or receive adverse treatment solely or partly because of his race or sex; (4) an individual's moral standing or worth is necessarily determined by his race or sex; (5) an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (6) an individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his race or sex; (7) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by members of a particular race to oppress members of another race; and (8) fault, blame, or bias should be assigned to a race or sex, or to members of a race or sex because of their race or sex. Nothing contained herein shall be construed as prohibiting any professional development training for teachers related to issues of addressing unconscious bias within the context of teaching certain literary or historical concepts or issues related to the impacts of historical or past discriminatory policies.

154.   To start, as the D.W. Daniel book review committee concluded, *Stamped* "does not amount to inculcating students into any theory or perspective."

155.    But even if *Stamped* did amount to inculcation, its pages are devoted to critiquing—not celebrating—the concepts prohibited by Proviso 1.78.

156.    In the book's introduction, author Ibram X. Kendi writes:

> A racist idea is any idea that suggests something is wrong or right, superior or inferior, better or worse about a racial group. An antiracist idea is any idea that suggests that racial groups are equals.

157.    The authors of *Stamped* yearn for an antiracist America "where no racial group is . . . thought of as more or less." *Stamped* at xv. Such a project is aligned with—not violative of—Proviso 1.78.

iii.    <u>The District's decision to remove *Stamped* was motivated by a desire to prevent students from being exposed to views that the Board members oppose.</u>

158.    The totality of the circumstances establish that it was the Board's hostility to the opinions contained in the book, not the book's educational suitability, that drove the decision to remove the book for five years. In the words of a COTU member, "the point is about content."

159.    Put simply: Rather than embracing the diversity of opinion that exists on the important and unavoidable issue of race in America, the Board simply voted to remove a book because it contained ideas about racism and America that the all-white Board didn't like.

**I.    The District's invented, *post hoc* justifications for removing *Stamped* lack merit.**

160.    On July 6, 2023, after this lawsuit was originally filed, the Board amended its ban of *Stamped* to allow access to students with parental consent.

161.    Then, in opposing relief for Plaintiffs, five current and former members of the Board signed declarations which included the following (identical) paragraph:

> My decision to vote on September 26, 2022 to remove *Stamped* from the curriculum, library, and media centers of School District of Pickens County high schools was the result of my analysis of the factual errors and omissions in *Stamped* and my conclusion that, as a result of these factual errors and omissions, the book is not intellectually appropriate or educationally suitable for students in the School District of Pickens County.

*See* ECF Nos. 9-5 (Garrison) at ¶ 13, 9-6 (Swords Decl.) at ¶ 14 (same), 9-7 (Bowers Decl.) at ¶ 11 (same), 9-8 (Haskett Decl.) at ¶ 9 (same), 9-9 (Kelley Decl.) at ¶ 9 (same).

162.    Board members' after-the-fact justification, which transparently tries to copy the facts in *ACLU of Florida v. Miami Dade County School Board*, 557 F.3d 1177 (11th Cir. 2009), fails thrice over.

i.    Defendant did not remove *Stamped* over concerns about "factual errors and omissions."

163.    To start, there is no reliable evidence that concerns over "factual errors and omissions" *actually* drove the Board's removal decision.

164.    Board meetings are recorded and are publicly available. Those recordings show that no member of the Board voiced concerns about historical accuracy at the meeting at which they banned *Stamped* nor couched their removal decision in those terms.

165.    Instead, Board members repeatedly stated their disagreement with the book. Then Board member Swords described it as "divisive" and "dangerous." Board member Bowers said that as a taxpayer, he did not appreciate "[his] money being spent on something like *that*." After the vote, Board member Williams shared an anecdote about the dangers of diversity, equity, and inclusion in the classroom before denouncing *Stamped* because it argues against the concept of colorblindness.

ii.    The pedagogical value of *Stamped* does not depend on its accuracy.

166.    Even had Board members paid lip service to concerns about "factual errors and omissions," the justification would still reek of fanciful pretext.

167.    The challenge to *Stamped* arose out of its use in a literature course, not a history lesson. To again quote the authors of *Stamped*: "I repeat, this is *not* a history book." *Stamped* at 1. Rather, as the district-level review committee highlighted, the book was meant to build students' ability to "analyze accuracy, tone, argument, and bias." For a high school student, a rigorously academic and conservatively written history text (to the extent that such texts exist) provides little opportunity to refine the skills targeted by the ELA standards.

168.     Thus, because *Stamped*'s accuracy is inessential to its pedagogical value, an indictment of its accuracy provides no grounds for prohibiting its use.

    iii.   *Stamped* does not contain material "factual errors or omissions."

169.     Finally, Board members marshal no support for their claim that *Stamped* contains material factual errors or omissions.

170.     An "expert" declaration submitted by Defendant from David Bernstein—a law professor, not a historian—does little more than quibble with the book's characterization of certain historical figures. *See* ECF 21-1 at 2–3 ("Calling Douglass' or King's ideas 'racist' is an outrageous distortion"), 4 (complaining that *Stamped*'s authors "consistently write about [Angela Davis] as if she was and is a major force.").

**J.     The District's removal of *Stamped* has violated, and continues to violate, the First Amendment rights of Plaintiffs.**

171.     Pickens NAACP represents members and children of members who attend District high schools and want to check out or otherwise access *Stamped: Racism, Antiracism, and You* in their school libraries, media centers, or classrooms. But because of Defendant's censorship, they cannot.

172.     The minor child of one Pickens NAACP member, for example, attempted to check out *Stamped* at Pickens High School in December of 2023 and was told by the librarian that the book was no longer available.

173.     The NAACP's mission is to achieve equity, political rights, and social inclusion by advancing practices that expand civil rights and eliminate discrimination. Consistent with its mission, the NAACP has a longstanding history of engaging in education-related litigation and advocacy to ensure that schools equip students to develop deeper understandings of the racial inequities that exist within society and expose them to diverse viewpoints. *Stamped: Racism, Antiracism, and You* does just that by encouraging students to have developmentally appropriate conversations on race and inequality.

174.    By censoring *Stamped: Racism, Antiracism, and You,* Defendant SDPC has frustrated NAACP's mission and prevented the members and children of members who the Pickens NAACP represents from accessing the book and engaging in subsequent conversation.

175.    SABB represents students at D.W. Daniel High School that oppose book banning. These students want to check out *Stamped* from their libraries and select *Stamped* as an optional curricular material in their English 3 classes, but cannot due to the District's censorship.

176.    As described below, SABB member and founder, L.K., attends D.W. Daniel High School, was not able to read *Stamped* as part of English 3, and is unable to check *Stamped* out of her school library because the District removed it. Other members of SABB are similarly situated because they cannot access *Stamped* in either their classrooms or their school libraries.

177.    SABB exists to advocate against book bans. As an organization, it believes in the freedom to read, and the freedom to access information. Its members regularly speak at public library meetings and other events to contest proposed book bans.

178.    SABB's members often read books that are banned (or that officials are threatening to ban).

179.    SABB is active on Instagram, where its members raise awareness about book bans by posting personal essays about banned books, quotes from banned books, and reading materials that it recommends.

180.    By censoring *Stamped*, Defendant SDPC has acted contrary to SABB's mission and violated its members' right to access information.

181.    Individual Plaintiffs J.T., G.T., H.L., C.L., and L.K. are similarly harmed by Defendant's conduct.

182.    J.T., G.T., H.L., C.L., and L.K. all currently attend D.W. Daniel High School, where *Stamped: Racism, Antiracism, and You* was, until Defendant's action, available as a library and media center resource and taught as part of the English 3 curriculum.

183.    In response to the political opposition to *Stamped*, H.L. wanted to check the book out before it was removed from his school.

184.    H.L. attempted to check out *Stamped* during the fall semester of 2024. When he asked for the book at the school library, the library's assistant told him that the library did not have the book and that it was not certain the library could acquire the book.

185.    Two days after H.L. attempted to check out *Stamped*, D.W. Daniel High School's assistant principal pulled him out of class to ask him if he tried to check out the book.

186.    D.W. Daniel High School provided H.L. with a parental consent form to access *Stamped*. H.L.'s mother, Susanna Ashton, signed the form and H.L. returned it to the school.

187.    H.L. took English 3 in the Fall of 2023, when he was a sophomore. Had *Stamped* been on the list of reading materials, H.L. would have chosen to read it during the American Dream unit. Because the District had removed *Stamped*, H.L. was unable to do so.

188.    C.L. will take English 3 beginning in January 2026. C.L. specifically desires to read *Stamped* as part of the unit on the American Dream. Unless the Defendant restores the book, she will not be permitted to do so.

189.    L.K. took English 3 in 2024, when she was a sophomore. Had *Stamped* been on the list of reading materials, L.K. would have chosen to read it during the American Dream unit. Because the District had removed *Stamped*, L.K. was unable to do so.

190.    Each student Plaintiff has a specific desire to access *Stamped: Racism, Antiracism, and You* in their school libraries and media centers.

191.    H.L., C.L., J.T., G.T., and L.K. want to check out *Stamped: Racism, Antiracism, and You* during the 2026 spring semester. Each Plaintiff intends to check out the book as soon as it is restored to their school's library. They cannot achieve these specific, concrete, planned activities because *Stamped: Racism, Antiracism, and You* has been removed by Defendant.

192.    Student Plaintiffs also want to be able to stop by the library and review their favorite passages of *Stamped: Racism, Antiracism, and You* or share those passages with other students that they talk to about the book. Even if the book is reinstated subject to a parental consent requirement, their ability to freely and spontaneously stop by and consult the library's copy of the book is impeded because the book will no longer be available on the shelf.

31

## CLAIMS FOR RELIEF

<u>Count 1: Violation of the First Amendment</u>
**42 U.S.C. § 1983**
(Prospective Relief, All Plaintiffs)

193.    Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

194.    The School District of Pickens County, acting through its Board of Trustees, removed every copy of *Stamped: Racism, Antiracism, and You* from District classrooms, curriculum, libraries, and media centers.

195.    The Board of Trustees removed *Stamped* solely based on its political disagreement with the ideas and views expressed in the book. The Board's decision was motivated by its desire to suppress ideas that do not comport with its members' political values and not by any legitimate pedagogical interest.

196.    Although the Defendant District wields considerable discretion to set curricula, the Supreme Court has "made it clear that imposition of 'ideological discipline' [is] not a proper undertaking for school authorities." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 877 (1982) (Blackmon, J., concurring) (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 511 (1969)). Indeed, as Justice Brennan explained in *Pico*, "[i]f a Democratic school board, motivated by partisan affiliation, ordered removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." *Id.* at 870–71. Yet that is exactly what the District did here.

197.    Even within a school's discretion to determine curriculum, it may only excise materials from its curriculum if the decision is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

198.    The District's removal of *Stamped* was not related to a legitimate pedagogical interest, was not tailored to achieve that interest, and fails any level of scrutiny.

32

199.     Plaintiffs have a specific desire and concrete plans to access *Stamped* in their libraries and to read and analyze *Stamped* as part of their curriculum. Because of the District's viewpoint-based removal of *Stamped*, Individual Plaintiffs and members of Pickens NAACP and SABB are experiencing ongoing injuries to their First Amendment rights to receive information. *See, e.g., Parnell v. Sch. Bd. of Lake Cnty., Fla.*, 731 F. Supp. 3d 1298, 1307–1308 (N.D. Fla. 2024) (finding plaintiffs' First Amendment rights were implicated by their county school board's book removal).

200.     On this claim for relief, Plaintiffs seek an order declaring that the District's removal of *Stamped: Racism, Antiracism, and You* violates the First Amendment and permanently enjoining the District's unlawful conduct.

201.     Plaintiffs are entitled to reasonable costs, expenses, and attorneys' fees under 42 U.S.C. § 1988 on this claim for relief.

Count 2: Violation of the First Amendment
**42 U.S.C. § 1983**
(Nominal Damages, Plaintiffs J.T., H.L., and L.K.)

202.     Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

203.     Plaintiffs H.L. and L.K. each took English 3 after the District removed *Stamped* from its libraries and curriculum.

204.     Each of these Plaintiffs wanted to read *Stamped* during the American Dream unit of English 3. By removing *Stamped*, the District deprived them of the opportunity to receive instruction or participate in classroom discussions regarding *Stamped*.

205.     Because the District prohibited H.L. and L.K. from using *Stamped* as part of their curriculum without a valid pedagogical justification, Defendants violated these Plaintiffs' First Amendment right to receive information.

206.     Plaintiffs J.T. and H.L. both attempted to check out *Stamped* from their school library after the Board removed it. Because the Board removed *Stamped* based on its ideological

33

disagreement with the book's contents, the Board violated J.T.'s and H.L.'s right of access to information.

207.    On this claim for relief, Plaintiffs each seek $18.99 in nominal damages, which is the list price of *Stamped* on Amazon.com.

208.    Plaintiffs are entitled to reasonable costs, expenses, and attorneys' fees under 42 U.S.C. § 1988 on this claim for relief.

## REQUEST FOR RELIEF

Plaintiffs respectfully request an order and judgment:

**i.**    Declaring that Defendant's removal of *Stamped: Racism, Antiracism, and You* violated Plaintiffs' rights secured by the First Amendment to the United States Constitution;

**ii.**    Permanently enjoining Defendant SDPC from removing *Stamped: Racism, Antiracism, and You* from District classrooms, libraries, and media centers;

**iii.**    Ordering Defendant SDPC to return all previously removed copies of *Stamped: Racism, Antiracism, and You* to District classrooms, libraries, and media centers.

**iv.**    Permanently enjoining Defendant SDPC from prohibiting District teachers from using *Stamped: Racism, Antiracism, and You* as a classroom resource;

**v.**    Awarding Plaintiffs J.T. and L.K. $18.99, and H.L. $37.98, in nominal damages.

**vi.**    Awarding Plaintiffs reasonable costs and attorneys' fees under 42 U.S.C. § 1988 and other applicable laws; and

**vii.**    Granting Plaintiffs such other relief as the Court deems just and proper.

Dated: **January 14, 2026**

34

Respectfully submitted,

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*
Allen Chaney
Fed. Id. No. 13181
Samuel Kennedy*
P.O. Box 1668
Columbia, SC 29202
T: (864) 372-6881
E: achaney@aclusc.org


**NAACP**

Janette Louard*
Quiana-Joy Ochiagha*
4805 Mt. Hope Drive
Baltimore, MD 21215
T: (410) 580-5777
jlouard@naacpnet.org


*\* Application for Admission Pro Hac Vice
Forthcoming*


*Attorneys for Plaintiffs*