**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| Pickens County Branch of the NAACP; | |
| Students Against Book Banning; | |
| Rebecca Turner and Brandon Turner, on behalf of minor children J.T. and G.T.; | Case No. 8:26-cv-00144-JDA |
| Susanna Ashton and Peter Laurence on behalf of minor children H.L. and C.L.; | |
| Cary Berkeley Kaye on behalf of minor child L.K., | |
| Plaintiffs, | |
| v. | |
| School District of Pickens County, | |
| Defendant. | |

**SCHOOL DISTRICT OF PICKENS COUNTY'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**[1]

Oral argument requested

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
Fed. ID No. 11594
2 West Washington Street, Suite 400
Greenville, SC 29601
miles.coleman@nelsonmullins.com
(864) 373-2300

*Attorney for School District of Pickens County*

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ........................................................................................................................1

PROCEDURAL BACKGROUND .....................................................................................................3

FACTUAL BACKGROUND ...........................................................................................................3

    I.    District parents objected to *Stamped*, initiating the District's review process. ..................4

    II.    The District Board voted to remove *Stamped* from District classrooms and libraries. .......4

    III.    The District reinstated *Stamped* in its high school libraries subject to parental consent.....6

    IV.    Plaintiffs have access to *Stamped* in the high school library and have either checked the book out or have declined the opportunity to do so. ...........................................................6

STANDARD OF REVIEW ..............................................................................................................7

ARGUMENT ..............................................................................................................................9

    I.    Plaintiffs' claims are barred by the applicable statute of limitations. ................................9

        A.    Plaintiffs filed this suit more than three years after their cause of action accrued, and they have not established a continuing violation. ..............................10

        B.    The repeat claims brought by the repeat minor students are time-barred and not statutorily tolled...............................................................................................11

        C.    The organizational Plaintiffs' claims are time-barred. ...........................................13

    II.    Plaintiffs' claims fail as a threshold, jurisdictional matter because they do not arise from cognizable, legally protected rights. ..................................................................................13

        A.    There is no cognizable right to receive information *from the government*. ............15

        B.    There is no cognizable free speech right to challenge government speech, including the curation of public-school instructional materials. ............................19

    III.    Plaintiffs lack standing.................................................................................................21

        A.    Plaintiffs lack standing to assert their library access claim.................................22

        B.    Plaintiffs lack standing to assert their curricular access claim..............................24

    IV.    Plaintiffs fail to state claims on which relief could be granted. ........................................26

A.    The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment. .............................................................................26

    1.    Under *Hazelwood*, the Board has broad discretion to regulate the District's curriculum. ..............................................................27

    2.    The Fourth Circuit, applying *Hazelwood*, has consistently held that a public school's governing body may dictate the school's curricula without violating the First Amendment............27

B.    The Board's decision to exclude *Stamped* from the District's libraries does not violate the First Amendment. ..........................................................................28

CONCLUSION......................................................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virgina*,
655 F.3d 342 (4th Cir. 2011) ...................................................................................11

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ...............................................................25, 29, 30, 31

*Amie v. Superior Court*,
99 Cal. App. 3d 421 (Cal. Ct. App. 1979) ..............................................................13

*Arjay Associates, Inc. v. Bush*,
891 F.2d 894 (Fed. Cir. 1989)...................................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................8

*Bailey v. Southwest Montana Drug Task Force*,
2008 WL 11415840 (D. Mont. May 27, 2008)........................................................12

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)....................................................15, 16, 29, 30, 32, 33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................8

*Bellotti v. Baird*,
443 U.S. 622 (1979).....................................................................................................22

*Blade v. U.S. Bankruptcy Court*,
22 Fed. App'x 487 (6th Cir. 2001) ...........................................................................14

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005) ....................................................................................18

*Boring v. Buncombe County Bd. of Educ.*
136 F.3d 364 (4th Cir. 1998) .........................................................................26, 27, 28

*Brantley v. Vaughan*,
835 F. Supp. 258 (D.S.C. 1993)..................................................................................8

*Brinsdon v. McAllen Indep. Sch. Dist.*,
863 F.3d 338 (5th Cir. 2017) ....................................................................................18

*Burrows v. French*,
  13 S.E. 355 (S.C. 1891) ...................................................................................................12

*C.H. v. Rankin Cnty. Sch. Dist.*,
  415 Fed. App'x 541 (5th Cir. 2011) ...............................................................................19

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022).......................................................................30, 32

*Cal. Parents for Equalization of Educational Materials v. Torlakson*,
  973 F.3d 1010 (9th Cir. 2020) .........................................................................................18

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005) ...........................................................................................20

*Dandy v. Am. Laundry Machinery, Inc.*,
  389 S.E.2d 866 (S.C. 1990) .............................................................................................12

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ...........................................................................................14

*Davis v. Lunceford*,
  335 S.E.2d 798 (S.C. 1985) .............................................................................................11

*Doe v. Obama*,
  631 F.3d 157 (4th Cir. 2011) ...........................................................................................21

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*,
  213 F.3d 175 (4th Cir. 2000) .............................................................................................8

*Epcon Homestead v. Town of Chapel Hill*,
  62 F.4th 882 (4th Cir. 2023) ...........................................................................................10

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..........................................................................................................23

*Fleck and Associates, Inc. v. Phoenix*,
  471 F.3d 1100 (9th Cir. 2006) .........................................................................................14

*Ford v. Georgetown Cnty Sch. Dist.*,
  No. 2:17-cv-01884-DCN, 2018 WL 4680134 (D.S.C. Sept. 28, 2018)..............................9, 10

*Gallman v. Dep't of Justice*,
  2017 WL 8809599 (D.S.C. Dec. 8, 2017) ........................................................................14

*Griswold v. Driscoll*,
  616 F.3d 53 (1st Cir. 2010)..............................................................................................10

iv

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..................................................................................................................23

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)........................................................................................................26, 27, 28

*Hishon v. King & Spalding*,
467 U.S. 69 (1984)......................................................................................................................8

*Humaid v. Garland*,
714 F. Supp. 3d 201 (W.D.N.Y. 2024)....................................................................................14

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................................................24

*Ill. Dunesland Preservation Soc'y v. Ill. Dept. of Nat. Resources*,
584 F.3d 719 (7th Cir. 2009) ...................................................................................................20

*Katyle v. Penn Nat. Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) .....................................................................................................9

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965)..................................................................................................................16

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ............................................................................................17, 18

*Loftus v. F.D.I.C.*,
989 F. Supp. 2d 483 (D.S.C. 2013)............................................................................................9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................................7, 21, 22

*Maldonado v. Harris*,
370 F.3d 945 (9th Cir. 2004) ...................................................................................................10

*Martin v. City of Struthers*,
319 U.S. 141 (1943)..................................................................................................................16

*Maryland Minority Contractors Ass'n v. Lynch*,
203 F.3d 821 (4th Cir. 2000) ...................................................................................................13

*Maxwell v. Lott*,
No. 3:23-5037-CMC-PJG, 2024 WL 3326524 (D.S.C. Feb. 21, 2024), *Report
and Recommendation adopted*, No. 3:23-5037-CMC, 2024 WL 3174498
(D.S.C. June 26, 2024)..............................................................................................................13

*Mayer v. Paschal*,
   498 S.E.2d 635 (S.C. 1998) ...............................................................................................12

*McConnell v. Fed. Election Comm'n*,
   540 U.S. 93 (2003), overruled on other grounds by *Citizens United v. Fed.
   Election Comm'n*, 558 U.S. 310 (2010).....................................................................13, 15, 17

*Miller v. Pac. Shore Funding*,
   224 F. Supp. 2d 977 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) ............................9

*MorningStar Fellowship Church v. York Cnty. S.C.*,
   No. 0:18-CV-03077-JMC, 2019 WL 2502049 (D.S.C. June 17, 2019) ...................................11

*Moss v. Gibbons*,
   536 N.E.2d 125 (Ill.App. 4th Dist. 1989) ...............................................................................12

*Muir v. Alabama Educ. Television Comm'n*,
   688 F.2d 1033 (Former 5th Cir. 1982)...............................................................................15, 29

*Nat'l Advert. Co. v. City of Raleigh*,
   947 F.2d 1158 (4th Cir. 1991) ................................................................................................11

*Page v. Lexington Cnty. Sch. Dist.*,
   No. 3:06-249-CMC, 2007 WL 2123784 (D.S.C. July 20, 2007)............................................21

*Pahls v. Thomas*,
   718 F.3d 1210 (10th Cir. 2013) ..............................................................................................17

*Papasan v. Allain*,
   478 U.S. 265 (1986)..................................................................................................................8

*People for the Ethical Treatment of Animals v. Gittens*,
   414 F.3d 23 (D.C. Cir. 2005)............................................................................................19, 20

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) ....................................................................................................3

*Pinkley, Inc. v. City of Fredrick*,
   191 F.3d 394 (4th Cir. 1999) ....................................................................................................7

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009)................................................................................................................20

*Presidents Council, District 25 v. Community School Board No. 25*,
   457 F.2d 289 (2nd Cir. 1972), cert. denied, 409 U.S. 998 (1972) ..........................................31

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
   945 F.2d 765 (4th Cir. 1991) ....................................................................................................8

*Rink v. Richland Mem. Hosp.*,
    422 S.E.2d 747 (S.C. 1992) ................................................................11

*Runck v. Kutmus*,
    997 F.2d 399 (8th Cir. 1993) ............................................................12

*Schatz v. Rosenberg*,
    943 F.2d 485 (4th Cir. 1991) ..............................................................8

*Searcey v. Harris*,
    888 F.2d 1314 (11th Cir. 1989) ........................................................28

*Straw v. United States*,
    2023 WL 4828034 (N.D. Cal. July 26, 2023)....................................14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..........................................................................24

*Sutliffe v. Epping Sch. Dist.*,
    584 F.3d 314 (1st Cir. 2009)........................................................20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................9

*Thomas v. Collins*,
    323 U.S. 516 (1945)..........................................................................16

*Toledo Area AFL-CIO Council v. Pizza*,
    154 F.3d 307 (6th Cir. 1998) ............................................................17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
    517 U.S. 544 (1996)..........................................................................24

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003)....................................................................19, 21

*Walls v. Sanders*,
    144 F.4th 995 (8th Cir. 2025) ..........................................................18

*Warth v. Seldin*,
    422 U.S. 490 (1975)........................................................................7, 14

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) ..........................................................3, 23

*White v. Murphy*,
    789 F.2d 614 (8th Cir. 1986) ............................................................12

**Rules**

Fed. R. Civ. P. 12(b)(1)..................................................................................1, 3, 7, 8, 14, 33

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 8, 33

Fed. R. Civ. P. 12(h)(3)......................................................................................................33

**Statutes**

S.C. Code. Ann. Regs. § 43-170 ..........................................................................................4

S.C. Code Ann. § 15-3-40..............................................................................................11, 13

**Other Authorities**

8/22/22 Board Meeting, https://tinyurl.com/5hwze3y9 ................................................5, 6

*Black's Law Dictionary* (8th ed. 2004).............................................................................30

Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign
    Finance*, 86 GEO. L. J. 45, 67 (1997) .......................................................................17

54 C.J.S. Limitations of Actions § 155..............................................................................13

Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation
    of the First*......................................................................................................17

Imbram X. Kendi, *Stamped: Racism, Antiracism, and You* ("*Stamped*").............1, 3, 4, 6, 22, 25

Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV.
    1258 (1994)..............................................................................................................17

Mark G. Yudof, *Personal Speech and Government Expression*, 38 CASE W. RES.
    L. REV. 671 (1987) ...................................................................................................21

*Webster's New Twentieth Century Dictionary* (1976).....................................................30

Yogi Berra, *The Yogi Book*: "*I Really Didn't Say Everything I Said*," 29-30 (1998) ......................1

"*It's like déjà vu all over again.*" – Yogi Berra[2]

The School District of Pickens County (the "District") moves pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' re-filed suit because the claims are untimely, lack a cognizable basis in the law, are asserted by Plaintiffs who lack standing, and fail to state viable claims.

## INTRODUCTION

This lawsuit arises from the District's Board of Trustees' removal of the book *Stamped: Racism, Antiracism, and You* ("*Stamped*") from the curricula, library, and media centers of the District's high schools. This suit is Plaintiffs' third bite at the apple. The Court dismissed their claims once, and later dismissed their improper, belated attempt to amend. Plaintiffs' new attempt suffers from the same problems as before—plus more.

*First*, they filed too late. Plaintiffs' claims arise from an allegedly unconstitutional decision that occurred more than three years before they filed this suit. Their claims are untimely. Plaintiffs can't excuse their delay by invoking the continuing violation doctrine or the minor tolling statute. As to the former, there's been no repeated action, only an alleged continuing effect, which doesn't qualify as a continuing violation. As to the latter, the returning minor plaintiffs can't invoke the tolling statute since they waived the protection when they filed their first suit. The organizational plaintiffs can't invoke it either. They're not minors and can't rely on someone else's tolling statute.

*Second*, even if the claims were timely, the Complaint fails because it doesn't assert legally cognizable claims. Article III requires a plaintiff to plead (and later prove) an invasion of a legally protected interest. Plaintiffs don't. There's no cognizable constitutional right to receive information *from the government*. Neither the Supreme Court nor the Fourth Circuit have recognized such a right, and this Court shouldn't either. Indeed, a majority of the Justices have concluded there *isn't*

---

[2] YOGI BERRA, THE YOGI BOOK: "I REALLY DIDN'T SAY EVERYTHING I SAID," 29–30 (1998).

1

such a right in public schools. Plaintiffs' claims are foreclosed by another bar—the government speech doctrine. A decision made by government employees in their government roles about books purchased with government funds, housed in government buildings, and used in government programs is government speech that's not subject to or constrained by the Free Speech Clause.

*Third*, Plaintiffs lack standing. Start in the library. Plaintiffs aren't injured because the book *is* available to them in the District's high school libraries. They already have the relief they seek, and most of them have already checked out and read the book. Others had the chance but chose not to check out the book. They also lack standing to challenge the removal of *Stamped* from classrooms. Plaintiffs haven't pled that they are (or will be) enrolled in an English 3 class taught by one of the few teachers in the District who formerly used *Stamped* as a supplemental text. They're not injured by the alleged removal of a book that wasn't in their class to start with. There's a redressability problem, too. Even if the Court granted the relief they seek and teachers *could* use the book as an optional text, it's speculative to think that they *would*.

*Fourth*, Plaintiffs' claims aren't viable. The Supreme Court, Fourth Circuit, and courts across the country have recognized that public school boards have broad discretion to select and remove materials from school curricula, even when those decisions are based on content or viewpoint. And neither the Supreme Court nor the Fourth Circuit has adopted the test Plaintiffs propose for the curation of public-school libraries. This Court shouldn't adopt it either. Even if Plaintiffs were right about the legal test they propose, the Complaint fails to allege nonconclusory facts to support their claims. The test they ask the Court to adopt requires them to allege (and later prove) that the *decisive factor* in the Board members' action was *their* intent to suppress ideas or views they disagree with. Plaintiffs allege nothing but conclusory assertions and speculation that *others*' motivations can be imputed to the Board. That's not enough to sustain a claim. The Court should dismiss.

## PROCEDURAL BACKGROUND

Plaintiffs initially filed suit on April 26, 2023, seven months after the Board voted to remove *Stamped*. [*See* Doc. 1, 8:23-cv-01736-JDA (D.S.C. Apr. 26, 2023) ("Prior Case").] The Court dismissed Plaintiffs' suit for lack of standing on October 7, 2025. [*Id*. at Doc. 72.] Three months later, Plaintiffs improperly attempted to file an Amended Complaint, and the Court struck the filing. [*Id*. at Doc. 75.] Plaintiffs re-filed their suit on January 14, 2026. [Doc. 1.] The new Complaint is brought by most of the same Plaintiffs against the same Defendant challenging the same action and asserting the same claims, but adding a student group as a new Plaintiff and replacing one minor child as a Plaintiff. [*Id*.]

## FACTUAL BACKGROUND[3]

In 2020, a couple of teachers in the District began using *Stamped* by Ibram Kendi and Jason Reynolds as an optional, supplemental text in some English 3 classes at D. W. Daniel High School. [Doc. 1 ¶ 57.] The book is intended for young adults and it "describes and deconstructs the history of racist thought in America." [*Id*. ¶ 1.] The authors (and Plaintiffs) emphasize that *Stamped* isn't a normal history book. [*Id*. ¶¶ 35–36.] Rather, they say it is a book about history written in furtherance of the authors' objective of exposing racist ideas in America. [*Id*. ¶¶ 37–41.]

Plaintiffs concede that, in pursuit of this goal, the authors of *Stamped* do not give a "neutral" account of history. [*Id*. ¶ 40.] That, perhaps, could be expected in an advocacy piece.

---

[3] The facts set out herein are drawn from the allegations of the Complaint and the documents relied on and incorporated by reference therein. *See Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion to dismiss into one for summary judgment).

In addition, to the extent that this Motion arises under Rule 12(b)(1) or 12(h)(3) for lack of standing and mootness, the facts set forth herein include those drawn from the parties' declarations and other exhibits. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (noting that when ruling on a motion to dismiss for lack of standing, the court may consider evidence outside the pleadings without converting the motion to one for summary judgment).

3

And, in the District's view, it could even be forgiven—if the historic account were at least objectively accurate. But when a book's account of history strays from the facts, even if in furtherance of a persuasive aim, questions regarding its educational suitability arise.

## I.     District parents objected to *Stamped*, initiating the District's review process.

In August 2022, three Pickens County parents formally expressed concerns regarding the use of *Stamped* at D.W. Daniel High School. [Doc. 1 ¶ 95.] These concerns initiated a review process established by District policy at the time.[4] Specifically, the District's Policy Manual provided a procedure by which a parent or guardian could challenge a book used in a District school. [*Id.* ¶¶ 75–94.] Under this procedure, parents or guardians completed a "Parent/Legal Guardian Request for Reconsideration of Instructional Materials" (a form known as "IJ-E"), which was sent to the superintendent, principal, and teacher whose material was criticized. [*Id.* ¶¶ 77–79.] The principal then appointed a school-level board of review to complete a review of the challenged material and submit a written report of its findings to the principal. [*Id.* ¶¶ 80–84.] If the parents or guardians wished to appeal the decision of the school-level board of review, they could request a review by a district-level committee. [*Id.* ¶ 85.] The District superintendent would then appoint a district-level board of review to complete a review and submit a written report. [*Id.* ¶¶ 87–94.]

Here, at the conclusion of the school-level review of *Stamped*, one of the complainants appealed to the district-level committee and, subsequently, to the Board. [*Id.* ¶¶ 104–10, 121.]

## II.     The District Board voted to remove *Stamped* from District classrooms and libraries.

On August 22, 2022, the Board held its monthly meeting and received public comments, most of which concerned the challenge to the use of *Stamped* at D.W. Daniel High School. [*Id.* ¶¶ 111–12.] The Board heard public comments supporting and opposing the use of *Stamped*. [*Id.*

---

[4] This policy has since been superseded by Regulation 43-170, Uniform Procedure for Selection or Reconsideration of Instructional Materials. S.C. Code. Ann. Regs. 43-170.

¶¶ 112–20]; *see also* SDPC Board of Trustees Meeting (In-Person) — 8/22/22 ("8/22/22 Board Meeting") at 1:10:50–1:41:50, available at https://tinyurl.com/5hwze3y9.[5] Some commenters expressed disagreement with the ideas or viewpoints in the book. The Board's members, however, primarily listened. None disagreed with the book's ideas or viewpoints, and the Complaint does not allege otherwise. The only one who voiced her view of *Stamped* during that meeting explicitly explained that she disapproved of the book not because of its ideas or viewpoints but because she found numerous factual errors when reading it and, as a result, thought it did not meet the standard of educational rigor required for the District's schools. 8/22/22 Board Meeting at 1:56:18–1:59:23.[6]

On September 26, 2022, the Board held its monthly meeting and received the findings of the District-level book review committee. [Doc. 1 ¶ 121.] During this meeting, one Board member moved to allow access to *Stamped* only with parental consent, which received two votes. [*Id.* ¶¶ 132–33.] Ultimately, the Board voted to remove *Stamped* from the curricula, libraries, and media centers of the District's high schools. [*Id.* ¶ 134.]

The video recordings of those meetings—recordings that are specifically referenced and incorporated in the Complaint—do not contain any statements (and the Complaint does not allege any non-conclusory facts to the contrary) indicating that any member of the Board, much less a

---

[5] The recording of this meeting is incorporated by reference in the Complaint. [*Id.* ¶¶ 112–20.]

[6] The Complaint distorts her comments, which are memorialized more accurately in the video quoted and incorporated by reference in the Complaint. Specifically, the Complaint cherry-picks her statement that she has "strong political leanings," and alleges "she agreed with two of the speakers," to imply that she shared their objection to the *ideas* in *Stamped*. [Doc. 1 ¶ 120.]

But that's not what she said. In reality, Ms. Williams noted that although she has political views, she subordinates them to her responsibility to listen to "every constituent" and evaluate materials for educational suitability, and that she agreed with commenters who had noted *repeated factual errors and omissions* in the historical narrative presented in *Stamped*, which, in her view, raised a legitimate pedagogical concern that the book was not educationally suitable for use in the District. [*See* 8/22/22 Board Meeting at 1:54:51–1:55:11; *id.* at 1:56:18–1:59:23.]

majority of the Board, were motivated by disagreement with the ideas or viewpoints expressed in *Stamped*. To the contrary, the Board's votes were not based on disagreement with the ideas contained in *Stamped* but on the Board members' conclusions that, because of factual errors and omissions in the book, it was not intellectually rigorous or educationally suitable for students in the District. [*See* 8/22/22 Board Meeting at 1:56:18–1:59:23 (Ms. Williams: "I too read the book, most of it . . . I just found error after error after error.  Errors of omissions.  Errors of commission . . . . What we really need to focus on here is . . . does this material meet the educational rigor that's required for one of the best school systems in our state.").]

### III.     The District reinstated *Stamped* in its high school libraries subject to parental consent.

On July 6, 2023, the Board voted to allow access to *Stamped* in the District's high school libraries subject to parental consent. [Doc. 1 ¶ 160.] This decision mirrors a motion that was made during the Board meeting of September 26, 2022. [Doc. 1 ¶ 132.]

The result of the Board's decision is that copies of *Stamped* are now available in the District's high school libraries subject to parental consent, and students may request the book through an intra-District Library loan if it is not available at their high school's libraries. [*See* 11.18.2025 Email Exchange with Sam Lepa ("Email Exchange"), attached as **Exhibit A**.[7]]

### IV.     Plaintiffs have access to *Stamped* in the high school library and have either checked the book out or have declined the opportunity to do so.

Plaintiffs allege that *Stamped* is no longer available in District libraries, asserting that a minor child of a Pickens NAACP member attempted to check out *Stamped* at Pickens High School in December 2023 and was told by the librarian that the book was no longer available. [Doc. 1 ¶ 172.] Similarly, Plaintiffs allege J.T. tried to check out *Stamped* from the D.W. Daniel library and found that the book was no longer in their library catalog. [*Id*. ¶ 12.] And they allege that H.L.

---

[7] This email is incorporated by reference in the Complaint. [Doc. 1 ¶ 14.]

attempted to check out *Stamped* from the D.W. Daniel library during the fall semester of 2024 but was told the library did not have the book. [*Id.* ¶ 184].

However, the documents incorporated in the Complaint paint a rather different picture from Plaintiffs' creative narrative. For example, the email exchange between H.L.'s parents and D.W. Daniel High School principal Sam Lepa referenced in the Complaint [*see id.* ¶ 14] reveals that *Stamped **was*** available to check out and that H.L.'s parents sent in a parental permission form for H.L. to check out *Stamped* through intra-district library loan. [*See* Ex. A (Email Exchange).] And the other students also turned in parental permission forms and were able to check out *Stamped*. [*See* Prior Case, Doc. 72 at 9 (noting that H.L., J.T., and S.K. were able to check out *Stamped* with completed permission forms).]

In sum, Plaintiffs have access to *Stamped* in the school library. At least three of them have checked the book out—meaning they have already received what they seek in this lawsuit—and the others have declined to pursue the opportunity to check it out.

<u>STANDARD OF REVIEW</u>

**Standing.** A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999). Federal courts have subject-matter jurisdiction only over justiciable cases or controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). Whether a plaintiff has standing to warrant the invocation of federal court jurisdiction presents a threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *See*

*Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

When the Rule 12(b)(1) challenge is raised not as to the sufficiency of the jurisdictional assertions in the plaintiff's complaint but to the underlying facts supporting those assertions, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id*. A court should grant a Rule 12(b)(1) motion to dismiss if the material jurisdictional facts are known and the moving party is entitled to prevail as a matter of law. *Id*.

**Failure to state a claim.** A motion to dismiss under Rule 12(b)(6) tests the complaint's legal sufficiency. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,* 213 F.3d 175, 180 (4th Cir. 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *Brantley v. Vaughan,* 835 F. Supp. 258, 261 (D.S.C. 1993). The court must take the facts in the light most favorable to the plaintiff, but need not accept the legal conclusions drawn from the facts. *Eastern Shore Mkts.,* 213 F.3d at 175 (citing *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991)). The court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" as true. *Id.*

A complaint must provide more than labels and conclusions to survive a 12(b)(6) motion to dismiss. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A mere recitation of the elements of a cause of action will not suffice. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* In that regard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

8

When ruling on a motion to dismiss, courts may consider documents integral to the complaint or specifically referenced in it, even if not physically attached to the complaint. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *Loftus v. F.D.I.C.*, 989 F. Supp. 2d 483, 489 (D.S.C. 2013). Here, the relevant portions of the District's Policy Manual and the Board Meetings can and should be considered by the Court because they are expressly discussed, relied upon, incorporated by reference, and/or cited within the Complaint. [*See*, *e.g.*, Doc. 1 ¶¶ 62–80, 97–120.]

## ARGUMENT

### I.    Plaintiffs' claims are barred by the applicable statute of limitations.[8]

Plaintiffs filed this present action nearly three and a half years after the Board initially voted to remove *Stamped*, over four months after their initial action was dismissed for lack of standing, and approximately a month after their attempted Amended Complaint was stricken as improperly filed. Simply put, Plaintiffs are now too late.

The statute of limitations for a First Amendment claim brought under § 1983 claim is three years. *Ford v. Georgetown Cnty Sch. Dist.*, No. 2:17-cv-01884-DCN, 2018 WL 4680134, at \*2 (D.S.C. Sept. 28, 2018) ("[I]t is well settled that the limitations period for § 1983 claims is determined by the analogous state law statute of limitations for a personal injury claim," and "[i]n South Carolina, the general statute of limitations for personal injury claims is . . . three years."). The Board voted to remove *Stamped* on September 26, 2022. [Doc. 1 ¶ 3.] Because it has been over three years since Plaintiffs knew or should have known a cause of action existed, their claims

---

[8] The Court may dismiss Plaintiffs' claims as time-barred before reaching the issue of standing. *See, e.g.*, *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) (disposing of most of the claims as time-barred before dismissing remaining plaintiffs for lack of standing).

are barred by the statute of limitations. Further, as explained below, neither the minor students who already brought suit nor the organizational Plaintiffs can rely on any tolling of the statute of limitations based on their minority, and thus the Court should dismiss their claims as time-barred.

**A.    Plaintiffs filed this suit more than three years after their cause of action accrued, and they have not established a continuing violation**.

An action accrues when a plaintiff has a "complete and present cause of action" and can "file suit and obtain relief." *Epcon Homestead v. Town of Chapel Hill*, 62 F.4th 882, 886 (4th Cir. 2023). Generally, this occurs "when the plaintiff knows or has reason to know of his injury." *Id.*

Here, Plaintiffs knew of their injuries when the Board voted to remove *Stamped* on September 26, 2022. The Complaint describes the September 26, 2022 vote as the catalyst for the claims asserted. [*See* Doc. 1 ¶¶ 3–5.] The Board meeting was public, and the Complaint references numerous public comments and engagement both before and after the vote. [*Id*. ¶¶ 112–19, 121–23, 135–37.] Thus, Plaintiffs' cause of action accrued when the Board voted to remove *Stamped* on September 26, 2022. *See, e.g.*, *Ford v. Georgetown Cnty. Sch. Dist.*, No. 2:17-CV-01884-DCN, 2018 WL 4680134, at *2 (D.S.C. Sept. 28, 2018), *aff'd*, 769 F. App'x 94 (4th Cir. 2019) (dismissing First Amendment claims as time-barred where a letter from school district warning against their conduct triggered the statute of limitations because "[a]t this point, [plaintiffs] knew that all of the elements of their cause of action existed—and at the very least were put on notice that they might have a First Amendment claim"); *see also Griswold v. Driscoll*, 616 F.3d 53, 53–55 (1st Cir. 2010) (dismissing First Amendment claims as time-barred and holding that the statute of limitations began to run when the board of education removed certain historical references from a curriculum guide); *Maldonado v. Harris*, 370 F.3d 945, 948 (9th Cir. 2004) (dismissing First Amendment claims as time-barred because the plaintiff knew that the defendant state agency had enacted a law regulating advertising displays and did not file his claim until years later).

10

Plaintiffs can't salvage their untimely claims by arguing that the conduct complained of is a continuing violation. "In general, to establish a continuing violation, the plaintiff must establish that the unconstitutional or illegal act was a fixed and continuing practice" in which "[t]he challenged action" is "*repeated*." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166–67 (4th Cir. 1991) (cleaned up) (emphasis added). Here, Plaintiffs claim that the allegedly unconstitutional act was the Board's vote to limit the use of *Stamped* in classrooms and libraries. That was a one-time action, not a "repeated" one. *Id.* Accordingly, this is not a continuing violation. Rather, it is (if anything) the continuing ill effects of the initial violation—and Plaintiffs' claims are therefore time-barred. *E.g.*, *A Soc'y Without a Name v. Virgina*, 655 F.3d 342, 349 (4th Cir. 2011) (holding that a government center's continued services to the homeless did "not amount to a continuing violation, but rather amount[ed] to the continuing effect of the original decision to locate the [center at the complained-of location]"); *MorningStar Fellowship Church v. York Cnty. S.C.*, No. 0:18-CV-03077-JMC, 2019 WL 2502049, at *11 (D.S.C. June 17, 2019) (holding that the denial of a building permit was not a new wrongful act but a consequence of the defendant declaring the plaintiff in default of an agreement, which was the harm alleged by the plaintiff).

Plaintiffs filed this suit, again, more than three years after the allegedly wrongful conduct occurred. The suit is too late. *Rink v. Richland Mem. Hosp.*, 422 S.E.2d 747, 749 (S.C. 1992) ("It is well settled in South Carolina that when an action is dismissed without prejudice, the statute of limitations will bar a subsequent suit if the statute runs in the interim.") (citation omitted).

**B.    The repeat claims brought by the repeat minor students are time-barred and not statutorily tolled.**

Plaintiffs may argue their untimeliness is excused because the three-year limitation period borrowed from state law is tolled during a plaintiff's minority. *See* S.C. Code Ann. § 15-3-40 ("If a person entitled to bring an action . . . is at the time the cause of action accrued . . . within the age

11

of eighteen years . . . the time of the disability is not part of the time limited for the commencement of the action."). That argument would be wrong. The minor students who have already brought these claims—all but S.K.—can't take advantage of minor tolling of the statute of limitations.

That's because J.T., G.T., H.L., and C.L. have waived the protection of minor tolling by having already filed suit:

> The Court concludes that the minor plaintiffs waived tolling by disability when they sought immediate legal redress. To hold otherwise would allow the minor plaintiffs to seek redress in multiple complaints while they are minors, and then sue again on the same facts upon achieving majority more than a decade after the first complaint was filed. The minor plaintiffs could seek immediate legal redress, or take advantage of tolling and wait until they turned eighteen; they cannot do both.

*Bailey v. Southwest Montana Drug Task Force*, 2008 WL 11415840, at \*4 (D. Mont. May 27, 2008); *see also Runck v. Kutmus*, 997 F.2d 399, 400–01 (8th Cir. 1993) (holding that, under a North Dakota statute, prisoner waived benefit of tolling statute by litigating actions while incarcerated); *Moss v. Gibbons*, 536 N.E.2d 125, 129–30 (Ill. App. 4th Dist. 1989) (holding that a prisoner waived legal disability tolling by filing suit); *White v. Murphy*, 789 F.2d 614, 615–16 (8th Cir. 1986) (holding that the statute of limitations on prisoner's civil rights action against state officials was not tolled during his imprisonment since prisoner had removed any disability he may have suffered by filing his complaint while he was still in prison).[9]

---

[9] Neither this Court nor the Fourth Circuit have previously considered waiver of the minor tolling statute's protections, though other jurisdictions (as cited) have plainly followed this exception. Likewise, South Carolina courts follow a practical, purpose-focused approach when analyzing when *not* to apply tolling statutes. *See*, *e.g.*, *Mayer v. Paschal*, 498 S.E.2d 635, 638 (S.C. 1998) (declining to apply a tolling statute because "[u]nder these circumstances, the tolling statute is inapplicable because the need to delay the running of the statute of limitations no longer exists"); *see also Burrows v. French*, 13 S.E. 355 (S.C. 1891) (refusing to interpret a tolling statute literally, and, instead, focusing on the purpose of the statute); *Dandy v. Am. Laundry Machinery, Inc.*, 389 S.E.2d 866, 868 (S.C. 1990) (declining to apply a tolling statute because the "purpose of the tolling statute is to remedy [a] problem" that "does not exist" in this case) (overruled in part on other grounds by *Atlas Food Sys. & Servs., v. Crane Nat. Vendors*, 462 S.E.2d 858 (1995)). So too here.

12

### C.    The organizational Plaintiffs' claims are time-barred.

The organizational plaintiffs (the NAACP and SABB) cannot take advantage of any minor tolling because they themselves are not minors, regardless of whether they bring the action on behalf of minors. *See Maxwell v. Lott*, No. 3:23-5037-CMC-PJG, 2024 WL 3326524, at *3 (D.S.C. Feb. 21, 2024), *Report and Recommendation adopted*, No. 3:23-5037-CMC, 2024 WL 3174498 (D.S.C. June 26, 2024) (holding that "the minor disability [in § 15-3-40] applies only to 'a person entitled to bring an action' under the Act" and did not toll the statute of limitations when an injured minor's mother brought an action on behalf of his estate); *Amie v. Superior Court*, 99 Cal. App. 3d 421, 426 (Cal. Ct. App. 1979) ("Furthermore, the disability of a minor which tolls the statute of limitations is personal and may not be transferred by assignment or subrogation. [] Assignment destroys the purpose of the tolling provision for minors."); 54 C.J.S. Limitations of Actions § 155 (discussing "personal disability which saves a person from the operation of the statute of limitations" and noting that "[t]olling due to such a disability does not apply to derivative . . . claims."); *Maryland Minority Contractors Ass'n v. Lynch*, 203 F.3d 821 (4th Cir. 2000) (Table) ("[A]n association's representative standing is derivative of its members' standing").

## II.    Plaintiffs' claims fail as a threshold, jurisdictional matter because they do not arise from cognizable, legally protected rights.

Even assuming that any of Plaintiffs' claims are timely, they still fail at the threshold for a fundamental reason: they don't allege the violation of any cognizable right. In the absence of a legally protected right, there can be no injury, no traceability, no redressability, and no cognizable claim. Accordingly, the claims fail for lack of subject matter jurisdiction or standing. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (holding the plaintiffs lacked standing because the

13

Court had "never recognized a legal right comparable to the broad and diffuse injury asserted" by the plaintiffs).[10]

Asking this question at the outset—whether Plaintiffs' claims rest on a cognizable right—isn't putting the merits horse in front of the standing cart. To present a case or controversy over which a federal court can have jurisdiction, a plaintiff bears the burden of establishing "a concrete and particularized invasion of a ***legally protected interest***." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (cleaned up) (emphasis added). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, . . . it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotation marks and citations omitted). For example, in *McConnell*, cited above, the plaintiffs claimed that

---

[10] Lower courts have likewise concluded that pleadings asserting non-existent or non-cognizable rights should be dismissed under Rule 12(b)(1) for lack of standing or lack of subject matter jurisdiction. *See, e.g.*, *Arjay Associates, Inc. v. Bush*, 891 F.2d 894, 896–98 (Fed. Cir. 1989) (dismissing plaintiff's constitutional claims and holding they "lack standing because the injury they assert is to a nonexistent right . . . and is thus nonredressable. . . . [T]hey have in this case no right capable of judicial enforcement and have thus suffered no injury capable of judicial redress."); *see also Fleck and Associates, Inc. v. Phoenix*, 471 F.3d 1100, 1104 (9th Cir. 2006) (holding the plaintiff corporation's suit alleging an unconstitutional invasion of its privacy should be dismissed for lack of standing because "corporations have no such privacy rights" and "[s]ince Fleck has not alleged the invasion of any cognizable right, it has failed to establish the 'irreducible constitutional minimum of standing.'") (citation omitted); *Blade v. U.S. Bankruptcy Court*, 22 Fed. App'x 487 (6th Cir. 2001) (affirming a district court's dismissal for lack of subject matter jurisdiction because "plaintiff's claims are not cognizable" under controlling precedent); *Humaid v. Garland*, 714 F. Supp. 3d 201, 208 (W.D.N.Y. 2024) (dismissing a case under Rule 12(b)(1) because "Plaintiff has failed to demonstrate that any harm he has suffered is based on 'a legally protected interest.' As discussed above, Plaintiff has failed to establish a cognizable constitutional claim . . . . Failing to show that he possesses a legally protected interest, Plaintiff has no standing to bring this action."); *Straw v. United States*, 2023 WL 4828034, *1 n.1 (N.D. Cal. July 26, 2023) ("As a threshold matter, Plaintiff lacks Article III standing. Plaintiff is unable to allege . . . an actual injury to a legally protected right. . . . Because no such right exists . . . Plaintiff has not alleged actual injury to a legally protected right, and this Court cannot provide Plaintiff's requested relief."); *Gallman v. Dep't of Justice*, 2017 WL 8809599, at *1 (D.S.C. Dec. 8, 2017) (R&R) ("Plaintiff's Amended Complaint should be summarily dismissed because it fails to raise a cognizable claim over which the court has subject matter jurisdiction.").

changes in federal campaign laws deprived them of an "equal ability to participate in the election process based on their economic status." 540 U.S. at 227. The Supreme Court held that plaintiffs lacked standing because the Court had "never recognized a legal right comparable to the broad and diffuse injury asserted" by the plaintiffs. *Id*.

So too here. The question (at least, in this threshold argument) isn't whether these particular plaintiffs' claims are viable under these alleged facts, but whether the claims could be viable under *any* set of facts—whether *any* person *could* have standing. If the alleged right on which the claim rests doesn't exist (as in *McConnell* and as here), then no plaintiffs—including these ones—can sue for a violation of the supposed right. Such is the case with the Plaintiffs' claims here, which fail to assert violations of a cognizable right for two independent reasons described below.

### A.    There is no cognizable right to receive information *from the government*.

Both claims asserted by the Plaintiffs rest on a right that doesn't exist: the supposed right to receive information *from the government*. [*See* Doc. 1 ¶ 199; *see also id.* ¶¶ 204–05.) Neither the Supreme Court nor the Fourth Circuit have ever recognized a constitutional right to receive information from the government. This Court shouldn't either.

Indeed, in the only Supreme Court case to consider public-school library book selection and removal, a majority of the Justices concluded that students had no right to receive information from the government. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). Admittedly, the severely fractured Court in *Pico* reached no clear majority holding. But one idea, at least, garnered majority agreement amid the splintered opinions: that the so-called right to receive information does *not* require a public-school library to shelve or retain a particular book. *See Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (noting that a "majority" of *Pico's* Justices agreed "there is no

First Amendment obligation upon the State to provide continuing access to particular books"). Chief Justice Burger's opinion said it plainly: "the right to receive information and ideas [] does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (citation omitted) (Burger, C.J., dissenting). Three other Justices joined that opinion in full, and a fourth agreed with this point.[11]

True, in *other* contexts, the Supreme Court has recognized that the First Amendment sometimes limits the government's power to prevent one private person from receiving speech *from another private person. See*, *e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 142–43 (1943) (holding that a city's prohibition on door-to-door distribution of "handbills, circulars[,] or other advertisements" violated the First Amendment based on a person's "right to distribute literature" and another's "right to receive it"); *Thomas v. Collins*, 323 U.S. 516, 538 (1945) (holding a court could not bar a union organizer from delivering a speech to company employees); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306 (1965) (holding the government could not burden someone's right to receive political literature through the mail).

But none of the right-to-receive-information cases concerned the alleged right to receive information *from the government*. And the Supreme Court has never suggested that the First Amendment obligates the government to provide information to anyone. Instead, the right to receive information is a *negative* right—the right to be free from "government interference with

---

[11] *See Pico*, 457 U.S. at 878 (Blackmun, J., concurring in part and concurring in the judgment) ("I do not suggest that the State has any affirmative obligation to provide students with information or ideas, something that may well be associated with a 'right to receive.'"); *id*. at 895 (Powell, J., dissenting) (agreeing with the Chief Justice that a "'right to receive ideas' in a school . . . . finds no support in the First Amendment precedents of this Court"); *id*. at 904, 910 (Rehnquist, J., dissenting) ("agree[ing] fully" with the Chief Justice's opinion and rejecting "the very existence of a right to receive information" in the school setting as "wholly unsupported by our past decisions and inconsistent with the necessarily selective process of elementary and secondary education"); *id*. at 921 (O'Connor, J., dissenting) (joining the Chief Justice's opinion).

the exchange of information by private citizens." Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008); *see also Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir. 1998) ("the First Amendment only 'protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights—requirements that the government act'") (quoting Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 GEO. L. J. 45, 67 (1997)); *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) ("The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints" given that "freedom of speech is a negative liberty."); Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV. 1258, 1277 (1994) (explaining that the First Amendment "is a source of negative rights against the government, not a repository of positive entitlement to government favors"). This negative-rights understanding of the Free Speech Clause is consistent with the constitutional text, which simply restricts the government's power to "abridge []" speech. U.S. CONST., amend. I.

Here, the student Plaintiffs turn this doctrine on its head, alleging that the Board's removal of Stamped violates Plaintiffs' "First Amendment rights to receive information." [*See* Doc. 1 ¶ 199; *see also id*. ¶¶ 204–05.] But this right-to-receive-content-from-the-government claim is novel, involving a "broad and diffuse injury," *McConnell*, 540 U.S. at 227, that is not legally cognizable. Again, neither the Supreme Court nor the Fourth Circuit has ever recognized a right to receive content from the government, and this Court shouldn't either.

The Fifth Circuit's recent en banc decision in *Little v. Llano County* is instructive. 138 F.4th 834 (5th Cir. 2025) (en banc). In that case, patrons of a county library in Texas sued the local librarian and other officials, alleging they removed 17 books because of their treatment of racial

17

and sexual themes. *Id*. at 836. The district court concluded that defendants abridged plaintiffs' "right to receive information" under the First Amendment and ordered the books be returned to the shelves; a divided Fifth Circuit panel affirmed in part. *Id.* The en banc court reversed, holding that "plaintiffs cannot challenge the library's decision to remove the 17 by invoking a right to receive information" because there is no right to receive "a book of their choice at taxpayer expense." *Id*. at 848, 850–51. The court reasoned that if a public library declines to purchase a book or removes a book from the shelves that it previously purchased, "the library does not prevent anyone from 'receiving' the information in it." *Id*. Because the library does not own every copy of every book, someone could buy the book themself, borrow it from a friend, or look for it at another library. *Id.*

Similarly, the Eighth Circuit's recent decision in *Walls v. Sanders* underscores the failure of the arguments propounded here by Plaintiffs. 144 F.4th 995, 1000 (8th Cir. 2025).  In *Walls*, two students sued government officials alleging an Arkansas law violated their rights under the First Amendment because it prohibited teachers from providing instruction and materials on Critical Race Theory. *Id*. at 1000. The court concluded that the students did not have standing to bring their claims because they were "unlikely to succeed on the merits of their right-to-receive claim[.]" *Id.*

Moreover, public school students have no constitutional right to be taught whatever, and however, they wish.[12] *See Brinsdon v. McAllen Indep. Sch. Dist*., 863 F.3d 338, 350 (5th Cir. 2017) ("Students, moreover, generally do not have a right to reject curricular choices as these decisions

---

[12] Likewise, to the extent the student Plaintiffs are nominally represented by their parents in this litigation, the parents also lack a constitutional right to dictate a public school's curriculum. *See Cal. Parents for Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) ("[W]ith respect to education, parents have the right to choose the educational forum, but not what takes place inside the school. . . . [T]he substantive due process right 'does not extend beyond the threshold of the school door.' [] Parents therefore do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities.") (citation omitted); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) (holding parents have no right to decide the school curriculum).

are left to the sound discretion of instructors."); *C.H. v. Rankin Cnty. Sch. Dist.*, 415 Fed. App'x 541 (5th Cir. 2011) (noting that a student "has no constitutional right to choose his own curriculum").

In sum, in the absence of a cognizable constitutional right, there's no case or controversy in which to exercise the Court's jurisdiction. Similarly, if there's no constitutional right, there can be no deprivation of that right. If there's no deprivation, there's no constitutional injury. And if there's no injury, then there's no standing. The Court should dismiss Plaintiffs' claims.

**B.      There is no cognizable free speech right to challenge government speech, including the curation of public-school instructional materials.**

Plaintiffs' claims fail at the threshold for another independent reason, namely that the selection, removal, and curation of public-school curricula and library books is government speech that's not constrained by the Free Speech Clause. Courts have reached this conclusion in the context of public libraries, and that reasoning applies even more strongly in the context of public schools. *See generally People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (hereinafter "*PETA*") ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality) (hereinafter "*ALA*") ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."). Selecting materials based on their "requisite and appropriate quality" necessarily means choosing some content and viewpoints while rejecting others, and the First Amendment allows this in the context of a public library (and, by implication, in the public-school context, too). *See ALA*, 539 U.S. at 204–08.

When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See Pleasant Grove*

19

*City v. Summum*, 555 U.S. 460, 467–72 (2009) (noting that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech," and holding that a city's decision of what privately-created material it would select and display on public grounds "constitute[s] government speech" and was "a government-controlled message" that involved the government "speak[ing] for itself"); *see also Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 330 (1st Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that when the government "uses its discretion to select between the speech of third parties for presentation" through government channels, that decision and selection constitutes government speech and "an expressive act by the government"); *Ill. Dunesland Preservation Soc'y v. Ill. Dept. of Nat. Resources*, 584 F.3d 719, 721 (7th Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that the government's selection of which private messages to display or present to the public constitutes government speech); *PETA*, 414 F.3d at 28 (rejecting plaintiff's Free Speech claim and, analogizing to the library context, noting that "the government speaks through its selection of which books to put on the shelves and which books to exclude").

The doctrine applies in the public-school setting too, which is part of a governmental program designed to accomplish a particular purpose and convey specific ideas and message selected by the government. *See Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (affirming the dismissal of First Amendment suit brought by a textbook author and noting that two "key" points to the analysis were (1) that "in establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement," and (2) "the government retains this discretion even where it chooses to employ private speakers to transmit its message"); *Page v. Lexington Cnty. Sch. Dist.*, No. 3:06-249-CMC, 2007 WL

20

2123784, at \*6 (D.S.C. July 20, 2007) (same); *see also* Mark G. Yudof, *Personal Speech and Government Expression*, 38 CASE W. RES. L. REV. 671, 687 (1987) ("Even in the school library, the librarian must normally implement the board's decisions, and certainly the writers of the books do not have a constitutional right to determine what books will be acquired.").

The First Amendment permits libraries to select between content and viewpoints as part of the permissible determination of materials' "requisite and appropriate quality." *See ALA*, 539 U.S. at 204–08. When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *Sutliffe*, 584 F.3d at 330. Plaintiffs' claims aren't cognizable and should be dismissed.

## III.     Plaintiffs lack standing.

Even if the Court finds that the statute of limitations does not bar Plaintiffs' claims and that Plaintiffs have asserted cognizable claims, their Complaint is subject to dismissal for the same reasons the Court dismissed Plaintiffs' prior Complaint: lack of standing. Plaintiffs' limited new allegations fail to confer standing and do not remedy the flaws already identified by this Court.

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing has three elements, each of which must be established:

(1) **Injury**. The plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. (internal citations omitted).

(2) **Traceability**. There must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id*.

21

(3) **Redressability**. It must be "likely," not merely "speculative" that the injury will be "redressed by a favorable decision." *Id*. at 561.

Even with their attempt at rehabilitating the Complaint, Plaintiffs' allegations fail to satisfy these elements. All Plaintiffs lack standing, and the Court should dismiss their Complaint.

### A.    Plaintiffs lack standing to assert their library access claim.

The five individual Plaintiffs are Rebecca and Brandon Turner, on behalf of their minor children J.T. and G.T. [Complaint ¶ 18]; Susanna Ashton and Peter Laurence, on behalf of their minor children H.L. and C.L. [*id*. ¶ 19]; and Cary Kaye, on behalf of her minor child L.K. [*id*. ¶ 20] (hereinafter, collectively the "Individual Plaintiffs"). All five children attend D.W. Daniel High School. [*Id*. at ¶¶ 18–20.] Plaintiffs have not alleged facts sufficient to show that they have standing to challenge *Stamped*'s removal from either the District's school libraries and media centers *or* the D.W. Daniel High School English 3 curriculum.

First, even if Plaintiff students have now alleged intent to check out *Stamped* from the high school library, *they can* check out the book. As of July 6, 2023, *Stamped* is available through intra-District loan with parental consent. [*See* Ex. A (Email Exchange).] There is no doubt that any of the Plaintiffs' children here would be able to readily secure a parental permission form (seeing as their parents brought a federal lawsuit on their behalf), and thus none of them can show an inability to access the book or requisite injury therefrom. *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 637 (1979) (plurality) ("The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors."). Indeed, in each of the specific instances cited by Plaintiffs in which students attempted to check out *Stamped* from the D.W. Daniel High School library, the student was able to check out the book once they submitted a parental permission form. *See supra* at *5*.

22

Second, Plaintiffs' attempt to salvage their lack of standing by alleging that the minor Plaintiffs "want to be able to stop by the library and review their favorite passages [and] their ability to freely and spontaneously stop by and consult the library's copy of the book is impeded because the book will no longer be available on the shelf." [Doc. 1 ¶ 192.] That argument fares no better. There is nothing stopping Plaintiffs from checking out the book with a parental permission slip and perusing it in the library or in the school hallways with their classmates—indeed, their parental consent forms are kept on file. [Ex. A (Email Exchange).] Plaintiffs have asserted no basis for a First Amendment right to spontaneity, and this allegation cannot save their lack of standing.

NAACP and SABB's claims fail, too. An organizational plaintiff may satisfy the standing requirements of Article III via organizational standing or associational standing. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). Under organizational standing, an organizational plaintiff has standing to redress injuries directly inflicted on the organization. *Id*. Under associational standing, an organizational plaintiff has standing to sue as a representative for one of its members to seek redress for the member's injury. *Id*.

A "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes [organizational standing]." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (holding plaintiffs, medical advocacy associations that incurred costs opposing the FDA's actions related to a certain prescription medication, lacked organizational standing to challenge the FDA's regulation of the medication because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Here, regarding organizational standing, the Complaint merely alleges that the District "has frustrated [Pickens] NAACP's mission" and "acted contrary to SABB's mission" by removing *Stamped* from Pickens County classrooms and libraries. [Doc. 1 ¶¶ 174, 180.] As this Court has already found [*see* Prior Case, Doc. 72 at 22], these conclusory allegations are insufficient to confer organizational standing.

The doctrine of associational standing allows organizations to bring an action on behalf of their members "in a representational capacity," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977), by "assert[ing] the standing of their members," *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 555 (1996) (observing that the injury-in-fact requirement of the *Hunt* test for associational standing is "an Article III necessity for an association's representative suit"). To establish associational standing, an organization must show that: (1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit. *Hunt*, 432 U.S. at 343. For the reasons discussed above, neither Pickens NAACP nor SABB have alleged that their members would have standing to sue as individuals, and thus the organizations' claims also fail for lack of standing.

**B.     Plaintiffs lack standing to assert their curricular access claim.**

Plaintiffs also fail to allege sufficient facts to support standing for their curricular claim.

First, Plaintiffs do not allege in the Complaint that, at the time the Complaint was filed, any of the minor children were enrolled in English 3 at D.W. Daniel High School *with a teacher* who has or will use *Stamped* as a companion text in the classroom. The Complaint alleges that minor children H.L., C.L., and L.K. already took or will take English 3 at D.W. Daniel High School and would have chosen to read *Stamped* during the American Dream unit had it been available as

24

an option. [Doc. 1 ¶¶ 187–89.] These assertions fail to meet *Lujan*'s imminence requirement. As an initial matter, Plaintiffs do not allege that the teachers for the English 3 classes that H.L., C.L., and L.K. were or are enrolled in have previously used *Stamped* as part of their curriculum. [*See generally* Doc. 1; *see also* Prior Case, Doc. 72 at 6–7 (noting that the teachers for the English 3 classes J.T. and H.L. were enrolled in had not used *Stamped* as part of their curriculum the previous year).] It is speculative to think that even if the teachers *could* use *Stamped* in their curriculum, they *would*. Accordingly, the Complaint does not allege a non-speculative injury relating to the District's removal of *Stamped* from its curriculum. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1196 (11th Cir. 2009).

Further, any new allegations that Plaintiffs' children were harmed because *Stamped* was no longer listed as recommended reading in the American Dream unit of English 3 are insufficient to confer standing.[13] [Doc. 1 ¶¶ 187–89.] Plaintiffs have no constitutional right to a *recommendation* for a book and, as discussed above, Plaintiffs' children may check out *Stamped* from the school library system at any time with parental permission (or, of course, order it online or check it out from the public library) and may read it independently alongside any unit in any class.

Even if Plaintiffs had alleged adequate facts to establish a constitutional injury capable of demonstrating standing, their alleged injury resulting from the alleged inability to study *Stamped* in English class is not redressable. Unless the Court is prepared to order specific high school teachers to choose and use one particular supplemental text over thousands of others or include certain texts on lists of recommended reading—an Order that Plaintiffs have not requested and

---

[13] It is unclear if this is what Plaintiffs are alleging [*see* Doc. 1 ¶¶ 187–89], but Pickens County will nevertheless address these allegations in the event they are distinct from Plaintiffs' allegations that the English 3 teachers are not using *Stamped* as a companion text.

which, respectfully, would not be appropriate for the Court to issue[14]—the relief sought by the Complaint will not redress Plaintiffs' alleged curricular injury.

And, for the same reasons discussed under the library access claim, the NAACP and SABB also lack organizational and associational standing.

## IV.    Plaintiffs fail to state claims on which relief could be granted.

Plaintiffs argue that the District violated the First Amendment both by removing *Stamped* from the high school curriculum and by removing it from the high school libraries. Plaintiffs fail to state a cause of action on both counts.

### A.    The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment.

Even if a public school's selection and management of curricula were the type of speech to which the First Amendment applies, Plaintiffs still fail to state a viable claim related to the removal of *Stamped* as an optional supplemental text from District classrooms. The Supreme Court has recognized that school officials have broad authority to exercise control—including content-based control—over curriculum if their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The Fourth Circuit has afforded broad discretion to public school boards when selecting and removing materials from curricula, even when those decisions are based on the content or viewpoint of the materials. *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364 (4th Cir. 1998). Accordingly, and as explained more fully below, Plaintiffs have failed to state a claim on which relief may be granted.

---

[14] *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364, 371 (4th Cir. 1998) ("Someone must fix the curriculum of any school, public or private. In the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities . . .").

1.    *Under* Hazelwood, *the Board has broad discretion to regulate the District's curriculum.*

In *Hazelwood*, the principal at a Missouri high school refused to allow a journalism class to publish two stories in the student newspaper about pregnant students and the impact of divorce on students. 480 U.S. at 263–64. The principal had several concerns with the stories' publication, including that the stories were not age appropriate for the audience. *Id.* at 263. The Supreme Court reversed the lower court and sided with the school administration, holding that these facts did not involve the suppression of student speech on school premises but, rather, involved a school's control of expressive activities that are "part of the school curriculum." *Id.* at 270–71. It found that because the newspaper at issue was part of the curriculum, the school officials could exercise greater control over it. *Id.* at 271. The court concluded that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. The District has wide latitude under *Hazelwood* over the selection and removal of materials such as *Stamped* in its schools' curricula. The exercise of that discretion does not violate the First Amendment.

2.    *The Fourth Circuit, applying* Hazelwood, *has held that a public school's governing body may dictate the school's curricula without violating the First Amendment*.

The Fourth Circuit has also ruled on this issue and sided with the authority of public-school boards and administrators to dictate the schools' curricula. *See Boring*, 136 F.3d at 369–70. *Boring* involved a high school teacher who chose a play for her advanced acting students to perform at a state competition, and, in preparation, had the students perform a scene from the play for an English class at the school. *Id*. at 366. After a parent complained that the subject matter of the play was too mature for the students, the principal placed limitations on the play's contents for the

27

competition and later requested the teacher's transfer from the school. *Id*. at 366–67. The teacher filed suit, alleging in part that the school violated her freedom of speech. *Id*. at 367.

Citing *Hazelwood*, the court took an expansive view of "curriculum," finding that curriculum includes school-sponsored publications, theatrical productions, and other expressive activities in addition to school curriculum "in a traditional classroom setting." *Id*. at 368 (citing *Hazelwood*, 484 U.S. at 271). The court also found that under the test set forth in *Hazelwood*, that the school had a "legitimate pedagogical interest" in excluding the play. *Id.* at 370. Not only did the court reason that "pedagogical" refers broadly to anything "relating to teaching," but it also held that the "makeup of the curriculum of [the school] is *by definition* a legitimate pedagogical concern." *Id*. (emphasis added) (citing to *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989), reaching the same conclusion). It ultimately held that "[i]n the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id*. at 371.

Accordingly, under both Supreme Court and Fourth Circuit precedent, the District cannot be in violation of the First Amendment for exercising discretion over its schools' curricula because the selection and makeup of school curriculum is, by definition, a legitimate pedagogical concern. That's particularly true when, as here, a Complaint alleges nothing but speculation and facts about *others'* motivations that could, if true, give rise to a viable claim. It's even more true when, as here, the evidence cited and incorporated into the Complaint indicates the opposite, namely that the Board had legitimate pedagogical concerns. *See supra* at 5 n.6 and accompanying text.

### B.     The Board's decision to exclude *Stamped* from the District's libraries does not violate the First Amendment.

Plaintiffs also allege that the District violated the First Amendment by removing *Stamped* from the high school libraries. The Supreme Court has only once considered the issue of whether

28

a school district may remove books from a public-school library. *See Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). *Pico's* fractured opinions provide no applicable, controlling precedent here, and Plaintiffs cannot show that the District violated the First Amendment even under the most favorable (to them) standard articulated by the Supreme Court.

In *Pico*, a school board voted to remove nine books from the district's middle and high school libraries because they posed a "moral danger" to the students. *See id*. at 857.  Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons. *Id*. at 865, 858–59. After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim. *Id*. at 859–60. The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id*. at 855, 882. In total, seven Justices filed opinions in *Pico*, and the Court was divided four-four on the constitutional issue of the extent to which the First Amendment allows the school board discretion to remove books from a school library. The result is that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.) (quoting *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment)).  With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned.  It establishes no standard." *See ACLU of Fla., Inc.*, 557 F.3d at 1200.

Even if this Court finds that Plaintiffs are entitled to the most favorable (to them) standard in *Pico*, Plaintiffs still cannot show that the District violated the First Amendment. The best-case

29

scenario for Plaintiffs is for this Court to adopt a standard that failed to attract even a majority in *Pico*: that school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. But even if this standard applies, Plaintiffs *still* have not plausibly alleged that the District violated the First Amendment if the District removed *Stamped* not for those prohibited reasons but for legitimate pedagogical reasons. *See*, *e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1202.

As a threshold issue, Plaintiffs have incorrectly and misleadingly asserted that the District "banned" *Stamped* from its libraries. [Doc. 1 ¶¶ 65, 76.] Not so. Book banning "takes place where a government or its officials forbid or prohibit others from having a book." *Id*. at 1218 (citing *Webster's New Twentieth Century Dictionary* 144–45 (1976) (defining "ban" as "to prohibit" or "to forbid")); *see also* BLACK'S LAW DICTIONARY 154 (8th ed. 2004) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means"). The term does not apply where a school district, through its school board, decides to remove a book from its own library shelves. *Id*. at 1219. Here, the District did not "ban" *Stamped*. Students are still permitted to buy the book, own the book, check the book out from the public library, bring the book to school, or discuss the book with their friends. Indeed, the Complaint asserts that SABB members "often read books that are banned." [Doc. 1 ¶ 178.] The District's selection of which books to include on its *own* library shelves is far from a "ban." *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 909 (E.D. Mo. 2022) (finding that it was "important at the outset for the Court to clarify something: this case does not involve banning books . . . [n]owhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book. Rather, through a policy enacted by its elected school board, the District allows librarians to use their best

judgment to remove books in select scenarios[.]"); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir. 1972), cert. denied, 409 U.S. 998 (1972) ("The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept.")

Second, the only non-conclusory factual allegation pled in the Complaint alleges that the District's Board removed *Stamped* for legitimate pedagogical reasons, namely that *Stamped* contains factual and historical inaccuracies. *See supra* at 5 n.6 and accompanying text. In *ACLU of Fla., Inc.*, the school board removed a book about Cuba from the school library because the board determined that it was not historically accurate. 557 F.3d at 1182. The 11th Circuit reversed the lower court, holding that the school district did not violate the First Amendment, reasoning that the "school board could remove book based upon numerous factual inaccuracies and misleading omissions therein." *Id*. at 1177. The court found that "[w]hatever else it prohibits, the First Amendment does not forbid a school board from removing a book because it contains factual inaccuracies, whether they be of commission or omission. There is no constitutional right to have books containing misstatements of objective facts shelved in a school library." *Id*. at 1202.

Similarly, in *Wentzville*, plaintiffs sought to enjoin a school district from removing eight books because they were not educationally suitable. *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 910–11 (E.D. Mo. 2022). The Court reasoned that *Pico* was not controlling but, like the *ACLU of Fla., Inc.* court, chose to adopt the more expansive standard of review in *Pico* "to give [Plaintiffs] a fair chance of prevailing." *Id*. at 915. The court

31

noted that the "*Pico* plurality recognized local school boards have 'a substantial legitimate role to play in the determination of school library content' and that districts have 'significant discretion' to determine the books available in school libraries." *Id*. (citing *Pico*, 457 U.S. at 869–70). The central issue is whether the school district intended to deny students access to ideas with which they disagreed and whether this intent was the "decisive factor" in their decision. *Id*. (citing *Pico*, 457 U.S. at 869–70).

The *Wentzville* court further found that "[t]his mens rea requirement necessarily means schools may remove books for numerous reasons. Indeed, if an intent to deny must be the *decisive* factor, schools may even remove books *partly* because they intend to deny students access to ideas with which they disagree." *Id*. (emphasis in original). The court ultimately denied the plaintiffs' motion for a preliminary injunction, holding that plaintiffs did not show that "the District intended to deny students access to ideas with which the District disagreed, let alone that the intent was the *decisive* factor in decision." *Id*. (emphasis in original).

Here, Plaintiffs have not plausibly alleged non-conclusory facts that, if true, would show that the District intended to deny students access to ideas with which it disagreed or that such intent was the decisive factor in its decision. The only reason given by Board members for voting to remove *Stamped* was because of its factual errors and omissions and, as a result, its lack of educational suitability.  [*See* 8/22/22 Board Meeting at 1:56:18–1:59:23 (Ms. Williams explaining her concerns were with *Stamped*'s repeated factual errors and lack of educational rigor).]  Plaintiffs make conclusory allegations that Board members were influenced by public comments and political pressure, but conclusory and speculative allegations cannot support their burden.

Thus, Plaintiffs have not plausibly alleged that the District removed *Stamped* from its high school libraries for anything other than legitimate pedagogical reasons, and have therefore failed

to allege facts sufficient to support a claim that the District violated the First Amendment even under the *Pico* standard, assuming it applies.

**CONCLUSION**

For the reasons stated above, this action should be dismissed because Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1), their claim is moot under Fed. R. Civ. P. 12(b)(1), the Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and 12(h)(3), and Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6). Wherefore, the District respectfully requests this Court enter an Order dismissing this action with prejudice and awarding such other relief as this Court deems just and appropriate.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s Miles E. Coleman
    Miles E. Coleman
    Fed. ID No. 11594
    2 West Washington Street, Suite 400
    Greenville, SC 29601
    miles.coleman@nelsonmullins.com
    (864) 373-2300

    *Attorney for School District of Pickens County*

Greenville, South Carolina
March 23, 2026

33